# Exhibit A

O6DVSECO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITYSCORECARD, INC.,

                    Plaintiff,

          v.                         24 Civ. 4240 (ER)

SAFE SECURITIES, INC.,
d/b/a SAFE SECURITY
and MARY POLYAKOVA,

                    Defendants.        Preliminary Injunction Hearing

------------------------------x
                                    New York, N.Y.
                                    June 13, 2024
                                    2:30 p.m.

Before:

                    HON. EDGARDO RAMOS,

                                        District Judge

                         APPEARANCES

PILLSBURY WINTHROP SHAW PITTMAN LLP
     Attorneys for Plaintiff
BY:  KENNETH W. TABER
     BRIAN L. BECKERMAN
     SARAH M. MADIGAN

GOODWIN PROCTER LLP
     Attorneys for Defendants
BY:  JOHN P. PADRO
     TIMOTHY KEEGAN

KUDMAN TRACHTEN ALOE POSNER LLP
     Attorneys for Defendant Mary Polyakova
BY:  MITCHELL E. EPNER

O6DVSECO

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Counsel, please state your name for

 3    the record.

 4              MR. TABER:  Good afternoon, your Honor.

 5              Ken Taber of Pillsbury Winthrop Shaw Pittman LLP, for

 6    plaintiff, SecurityScorecard.

 7              With me are my colleagues Brian Beckerman and Sarah

 8    Madigan, and a representative from our client, Steve Cobb.

 9              MR. PADRO:  Good morning -- good afternoon, your

10    Honor.  John Padro from the firm Goodwin Procter, on behalf of

11    defendant SAFE Securities.

12              With me are my colleagues Tim Keegan here to the

13    right, and I have my colleague in the gallery, Ms. Dena Kia.

14              MR. EPNER:  Good afternoon, your Honor.

15              Mitchell Epner, Kudman Trachten Aloe Posner, for

16    defendant Mary Polyakova.

17              THE COURT:  Good afternoon to you all.

18              This matter is on for a hearing on plaintiff's request

19    for a preliminary injunction.  I believe I've received all the

20    papers.  I think the last thing that came over the transom was

21    the supplemental affidavit of Mr. Lee; is that correct?

22              MR. TABER:  Your Honor, I'm not sure if that preceded

23    or the document that we sent which was a revised proposed

24    order.  That came late this morning.

25              THE COURT:  I don't know that I have that.
```

O6DVSECO

| | |
|---|---|
| 1 | MR. TABER:  I have a copy, if your Honor would like. |
| 2 | THE COURT:  Please. |
| 3 | Okay.  So since there has been some movement in the |
| 4 | way things played out, Mr. Taber, why don't you tell me where |
| 5 | we are from your perspective. |
| 6 | MR. TABER:  Sure.  Thank you, your Honor. |
| 7 | THE COURT:  You can remain seated, sir.  Just bring |
| 8 | the microphone close to you. |
| 9 | MR. TABER:  Okay. |
| 10 | Your Honor, we see three things at issue before you |
| 11 | today that necessitate the entry of a preliminary injunction. |
| 12 | The first is that Ms. Polyakova took from our client — |
| 13 | and does not deny taking from our client — a list that |
| 14 | contained 500 client names and extensive details on each of |
| 15 | those 500 clients.  That same list contained approximately |
| 16 | 8,000 prospect names.  And then there are two additional lists |
| 17 | that are what we refer to as the CISO list, which are lists of |
| 18 | chief information security officers that were to be invited to |
| 19 | an event.  There are 200 of those individuals listed there. |
| 20 | And then the final thing that we see at issue is the |
| 21 | improper and unlawful, we submit, access to our customer-only |
| 22 | platform by defendant SAFE. |
| 23 | That's what's before the Court. |
| 24 | THE COURT:  I'm sorry.  But that's a very different |
| 25 | type of conduct; correct? |

O6DVSECO

1          MR. TABER:  Correct.  Different in every aspect, I

2     would say.

3          THE COURT:  Okay.

4          MR. TABER:  But, nonetheless, something that by

5     injunction we're asking the Court to put an end to, so that

6     there are no further surreptitious efforts by the defendant

7     SAFE to get onto our platform, pretending to be a customer, and

8     gain access to all of the customer-only information that's on

9     there.  So that's also part of our injunctive relief request.

10    But it is, as your Honor points out, quite different from the

11    customer and prospect names.

12          The defendant here SAFE is a relatively new company

13    which has a grand total of 100 clients, as compared with our

14    roughly 2,000 clients.  And so we submit, your Honor, that the

15    information that Ms. Polyakova took and that she has — although

16    it's now in the hands, we are told, of a vendor that they've

17    retained — would be a treasure trove of invaluable information

18    for this fledgling new company SAFE to be able to come to

19    market and know who are the buyers of these kinds of services,

20    when their contracts run out, what their contract volumes are.

21    It's a virtual roadmap for success for them and, frankly, they

22    don't deserve it.

23          THE COURT:  Can you tell me in a nutshell what

24    SecurityScorecard does.

25          MR. TABER:  Sure.

O6DVSECO

1      It's essentially, your Honor, two businesses, both of

2  which relate directly to the field of cybersecurity.

3      The first business is they create ratings based on

4  billions of hits every day on the internet as to the

5  cybersecurity of each company that they monitor.  And they

6  monitor thousands, if not tens of thousands, of companies.  And

7  that information is very valuable if you are engaged in

8  business and want to deal with a vendor, want to know am I safe

9  in sharing data with that vendor, do they have safe practices,

10  and are they the subject, for example, of leaks of information

11  on the dark web.  So customers pay a lot of money for those

12  security ratings.

13      And then what they do is they buy what are called

14  slots.  Each slot allows them to review the security of another

15  company as collected in this proprietary database.

16      THE COURT:  I'm sorry.

17      MR. TABER:  Sure.

18      THE COURT:  So as I understand it, SecurityScorecard

19  monitors the websites or the digital exposure of companies that

20  are not even their clients.

21      MR. TABER:  Correct.

22      THE COURT:  You said tens of thousands.

23      MR. TABER:  Way more.  I suspect I'm actually low on

24  that, your Honor.  As I said those words, I'm thinking it's

25  probably more like hundreds of thousands.  And I'm asking

O6DVSECO

1    Mr. Cobb.

2              MR. COBB:  Twelve million-plus.

3              THE COURT:  Twelve million companies?

4              MR. COBB:  Twelve million-plus, yes, your Honor.

5              THE COURT:  There are 12 million companies in the

6    U.S.?

7              MR. TABER:  Worldwide.

8              THE COURT:  Worldwide.

9              And when you buy a slot, you buy to see information

10   about other companies and not about yourself?

11             MR. TABER:  Correct.

12             THE COURT:  Why?

13             MR. TABER:  Why?  Because if you're about to deal with

14   somebody as a vendor -- many of the security breaches that we

15   read about, the cybersecurity attacks, involve people who come

16   in through one company and garner the data of other companies.

17             For example, there was, in the healthcare world, a

18   subsidiary of UnitedHealthcare was hacked.  And the hacking of

19   that data actually affected healthcare institutions all around

20   the world because everybody traded data into them.  So before

21   you give your data into another company, you want to know, is

22   that other company secure; where do they stand in terms of

23   their cybersecurity protections.  And one of the ways to

24   evaluate that is to buy a slot on the SecurityScorecard

25   network.

O6DVSECO

1        And you can monitor on a daily, hourly, or

2   minute-by-minute, if you choose, basis how secure that entity

3   is that you're about to do business with or that you're

4   continuing to do business with.  You can monitor whether they

5   themselves are having breaches that are known on the internet

6   and that are resulting in their data being available for

7   purchase on the dark web, for example.

8        THE COURT:  So a slot gives you insight into a

9   particular company --

10       MR. TABER:  Correct.

11       THE COURT:  -- not all 12 million.

12       MR. TABER:  Correct.

13       THE COURT:  Okay.

14       MR. TABER:  One slot.

15       So you, as a company officer charged with protecting

16  the data of your company, might decide you need 20 slots, or

17  you might decide you need 1,000 slots.  You buy the slots.  And

18  that is something that you contract for with SecurityScorecard.

19  And typically, these contracts are multi-year contracts; they

20  have expiration dates.  Knowing when the expiration date is

21  going to occur, which is among the information that was stolen

22  here, is enormously valuable to somebody who's trying to sell a

23  competing service in the cybersecurity world to that same

24  customer.  That's what was taken.

25       THE COURT:  Okay.  So that's one aspect.

O6DVSECO

1      MR. TABER:  That's the first aspect related to the

2  security monitoring.

3      The second aspect are what we refer to in our papers

4  as bespoke cybersecurity advisory services.  SecurityScorecard

5  will come into a company and will study that company and tell

6  them how to enhance their cybersecurity.  Think of it almost as

7  a consulting kind of practice.  It's typically a high-value

8  service that people pay a lot of money for.  And getting those

9  contracts, those relationships, is enormously valuable.  And

10  that's a second business in which SecurityScorecard has been

11  quite successful.  And those customers are also on the list of

12  what was taken.

13      And the list details for each customer, your Honor,

14  what it is that they buy, how many slots they buy, if they are

15  in that end of the business, what kinds of consulting services

16  they buy, what business partners they work with, all of that is

17  laid out in the information that was stolen here.  And it is

18  enormously valuable if you're a new competitor entering into

19  this space and trying to build your business from 100

20  customers, which is what SAFE Security has today, according to

21  the papers that they filed, to the level of SecurityScorecard,

22  which has over 2,000 such customers.

23      THE COURT:  And those 2,000 customers are in either

24  one or both of the two lines of business.

25      MR. TABER:  Correct.

O6DVSECO

| | |
|---|---|
| 1 | THE COURT:  So that's a total number. |
| 2 | MR. TABER:  Correct.  Total number of customers. |
| 3 | THE COURT:  Okay. |
| 4 | MR. TABER:  And they may be in both business lines. |
| 5 | There is no doubt, your Honor, on the papers that have |
| 6 | been filed now that Ms. Polyakova took without authorization |
| 7 | those lists. |
| 8 | She claims in her papers, Oh, no, my two supervisors |
| 9 | approved it.  And her counsel gave me the name of the two |
| 10 | supervisors who supposedly approved it.  Neither of those |
| 11 | supervisors was at SecurityScorecard at the time that she took |
| 12 | the materials; and indeed neither of them had been there any |
| 13 | more recently than eight months before she took the materials. |
| 14 | THE COURT:  Her affidavit doesn't identify particular |
| 15 | individuals. |
| 16 | MR. TABER:  Correct. |
| 17 | THE COURT:  It just said that she did it with the |
| 18 | knowledge of supervisors. |
| 19 | MR. TABER:  Correct.  Her affidavit didn't have the |
| 20 | names.  And when her lawyer and I, Mr. Epner, spoke, and he |
| 21 | first approached me about trying to resolve this and told me |
| 22 | the story that two supervisors had approved her doing it, I |
| 23 | specifically asked him to give me the names of those |
| 24 | supervisors so I could go back to my client and ask if that, in |
| 25 | fact, ever happened. |

O6DVSECO

1          And he gave me those names.  They were Mr. Salamanca
2     and Mr. Moreland.  And I went back to the client and said, Is
3     there any way that they gave those permissions?  And the client
4     laughed and said, There's no way they gave permissions; they
5     haven't even been here at the time that she took the stuff for
6     more than eight months in either case.  So that explanation, we
7     submit, your Honor, has been completely shattered.  There's
8     been no response on that to this point since we put in those
9     papers to your Honor yesterday.
10          They did, I should say, correct something that, it's
11     possible, we had wrong.  We thought that she had edited the
12     documents on May the 6th.  They have come back — these are the
13     papers I think your Honor referred to that came in this morning
14     — and said that those documents were edited, but they were
15     edited by people at SecurityScorecard.  I'm not smart enough to
16     know if you can really do that when the documents are in her
17     possession.
18          I asked the client.  The client said if they're Google
19     Share documents, this is a way to do that.  I told the client
20     go ask the people that they claim did that editing, if they did
21     the editing.  The client did so and advises me that neither of
22     them recall doing it.  I don't know if it happened or not; I'm
23     not going to represent to the Court one way or the other.  This
24     is a little bit of telephone; he told me, they told me,
25     whatever.  So for the moment, your Honor, we're not going to

O6DVSECO

1   press the point that she edited this stuff on May the 6th,

2   because we'll need discovery to get to the bottom of that.

3        But where we are now, your Honor, and I alluded to

4   this a moment ago, is we've discovered in just a little bit of

5   time — because we haven't actually conducted formal discovery

6   of any kind at all.  But we've uncovered that it was untrue

7   when Ms. Polyakova said that it was Ms. Salamanca and

8   Mr. Moreland who blessed her doing this.

9        And we've also uncovered, your Honor, that her stated

10  explanation in her affidavit, that the reason she needed to do

11  this was because she wanted to work with these documents in

12  Google spreadsheets or Excel is also untrue.  And we know that

13  because, as Mr. Cobb says in the affidavit that we put in

14  yesterday, those capabilities are fully available on the

15  SecurityScorecard platform itself.  You don't have to email

16  something to yourself at home in order to be able to work in

17  Google spreadsheets or Excel.

18        THE COURT:  Because I'm going to get easily lost in

19  the technology, as I understand it, while she may have emailed

20  it to her personal emails, they were not present in her actual

21  devices; correct?  They were somewhere on a Google cloud.

22        MR. TABER:  So says the forensic person that put in an

23  affidavit for them.  We have no knowledge if any of that is

24  true.  As the case progresses, your Honor, we will, of course,

25  ask to image those devices, find out what the provenance is.

O6DVSECO

1          We do know where she emailed it.  We know the email

2     address it went to.  Where it went from there, we don't have

3     any information at this stage until we conduct discovery.  It's

4     undisputed she emailed it to herself.  It's also undisputed

5     that the policies at SecurityScorecard said thou shalt never do

6     that.  Because when you email confidential documents to

7     yourself, they are no longer in a secure environment, and

8     anybody can get them, and you can send them to anybody.

9          You could, for example, your Honor, I am told, upload

10     them to a site like box.com, and there would be no record that

11     you had done that, unless somebody was smart enough to go get

12     the records from box.com and see if they were there.  But there

13     are, in fact, thousands of those kinds of sites that you can

14     upload them to.

15          And that's a key reason, your Honor, that we're here

16     for injunctive relief.  Because we know the information —

17     critical information — was stolen.  We know that Ms. Polyakova

18     had it, and we have no idea what she did with it.  And we need

19     her and SAFE to be enjoined from using it, disseminating it in

20     any way, shape or form, because it's the lifeblood of our

21     company.  And that is an objective that, candidly, we think we

22     can only accomplish through injunctive relief issued by your

23     Honor.  Otherwise, we are completely at the mercy of Ms.

24     Polyakova and SAFE to do with this critical information

25     whatever they choose.

O6DVSECO

1          THE COURT:  You've been using a lot of loaded words,

2     Mr. Taber, and I haven't stopped you.  But is it the case, as

3     Ms. Polyakova submits in her affidavit, that prior to the time

4     that she was fired -- or terminated, it was a reduction in

5     force.

6          MR. TABER:  Reduction in force; correct.

7          THE COURT:  Prior to the time that she was laid off,

8     was she or any other employees at her level or below aware that

9     the reduction in force was in place, was going to take place?

10         MR. TABER:  I can't tell you what was in her mind.  I

11    can tell you that there were actually two reductions in force,

12    one in January and one in April.

13         The one in January, I can tell you that she was

14    considered for that reduction in force, and was on a list to be

15    included in that reduction in force.  And we don't know if she

16    found out about that or not.  Ultimately, she was not let go in

17    the January reduction in force, but she was let go in the April

18    reduction in force.

19         So did she know that that was coming?  I can't tell

20    you.  We'll take her deposition and we will certainly ask those

21    questions.

22         I can tell you that everybody at the company, when

23    they found out that she had downloaded this to her personal

24    email — and that was not discovered, your Honor, until, I think

25    it was, May 21.  It was discovered as part of a concern by the

O6DVSECO

1    company that information seemed to be leaking out of

2    SecurityScorecard to SAFE.  And so they investigated multiple

3    channels.

4         At that date, May 21st, the rumor mill said that Mary

5    was going to SAFE.  She hadn't actually started there yet, but

6    she, I guess, had told friends, who had told friends, and we

7    heard she was going to SAFE.  So hers was one of the email

8    accounts that we checked, and people were quite surprised.  I

9    don't want to use a loaded word.  Quite surprised that she had

10   downloaded this stuff to her personal email, because that was

11   strictly forbidden at the company.  And in particular, they

12   were concerned at what it was she had downloaded.

13        THE COURT:  And she also indicates that particular

14   purposes for which she did that, right?  I mean, she says that

15   she downloaded the list of customers because she was

16   rebalancing the workload of her reports.

17        MR. TABER:  Right.

18        THE COURT:  And that she downloaded the list of CISOs

19   because she was planning some sort of party or some event.

20        MR. TABER:  A joint party with another organization is

21   her story.

22        THE COURT:  Do you have any reason to believe that she

23   wasn't engaged in those activities at the time that she --

24        MR. TABER:  I have every reason to believe that she

25   didn't need to download it to her personal email to do either

O6DVSECO

1    of those things.  Both of those things were easily done on the

2    SecurityScorecard internal platform.  Google Spreadsheet, which

3    is what she said they used, easily done.  She says that there

4    was -- I think her stepdaughter or somebody who helped her do

5    it.  If she had wanted somebody from outside to have access to

6    help her do that, also easily done on the SecurityScorecard

7    platform.  You never need to remove information of that kind

8    from the secure environment at SecurityScorecard in order to do

9    those kinds of routine business tasks.  It doesn't make any

10   sense.  The explanation makes no sense.

11            THE COURT:  Okay.  So I can take it that I can assume

12   from your answer that you have no reason to believe that she

13   wasn't working on those activities that she says --

14            MR. TABER:  I don't know.  It would not be outside of

15   her job responsibilities to be working on those activities, so

16   I'm not going to quarrel with that.  The way that she said she

17   needed to do it, we quarrel very strongly because it's not

18   true.

19            THE COURT:  Okay.

20            MR. TABER:  Okay?

21            So where we are now is, according to the papers from

22   the other side, they have put the documents that were taken in

23   the hands of a vendor by the name of document mountain?  What's

24   the vendor name?  I'm sorry, Digital Mountain.  It's in the

25   hands of a vendor, Digital Mountain.  And they say she can't

O6DVSECO

1    access it and SAFE can't access it, and that's good enough.  To

2    which I say, your Honor, we're not -- we can't be satisfied by

3    that.  We have no control over Digital Mountain; that's a

4    vendor they hired.  We can't stop Digital Mountain after today,

5    when we're gone from your courtroom, from giving these things

6    back to them without an order from your Honor that says that

7    all copies of these documents, whether they are at Digital

8    Mountain or whether they are in a Box account or whether they

9    are sitting on her desk at home, all copies must be destroyed.

10   They don't deserve them.  They have no right to them.

11          If the other side wants to keep copies at the offices

12   of Goodwin Procter or Mr. Epner's office, fine.  We don't

13   have -- but that's for litigation purposes.  They're officers

14   of the Court.  We'd be fine.  But every other copy of this very

15   valuable information should be destroyed.  There is no reason

16   for it to be in the possession of a vendor of theirs or anyone

17   else, frankly, or in any other account.

18          And I want to know, your Honor, if we discover that

19   it's still sitting in a Box account and bring that to your

20   attention, that that's going to be a candidate for contempt of

21   court.  We need an injunction that makes all of that possible;

22   because this information is the lifeblood of our client, and it

23   represents 20 percent of their entire customer base.

24          The key issues, I think, for purposes of an injunction

25   are irreparable injury.  We think that the fact that this is 20

1   percent of our client base and five times the size of their

2   client base, the 500 clients that we're talking about here, is

3   sufficient to establish irreparable injury when a direct

4   competitor has that information.  There's no doubt they are a

5   direct competitor.  You can go to their website; and we gave

6   you in our papers the location.  And you'll see they have a

7   direct comparison:  SecurityScorecard versus SAFE; advantages,

8   disadvantages of each.  So they are a direct competitor.  And a

9   direct competitor having your customer list, there's lots of

10  law in this district and nationwide that that's subject to

11  trade secret law and injunctions under the DTSA or the, I dare

12  say, routine remedy to protect against that.

13          If we don't get injunctive relief, your Honor, we're

14  put into a world where every time they get a new account, we

15  will have to conduct discovery as to whether they got that new

16  account on their own or because they knew from us that that was

17  an account that was about to come up for renewal or because

18  they knew from us specifically what it was that account wanted.

19  We will be in a maras with respect to hundreds, if not

20  thousands, of customers for years to come to try to figure out

21  whether they did business legitimately or illegitimately based

22  on the information that they had from us.

23          Do we meet the likelihood of success on the merits

24  test?  I think if we go claim by claim, the trade secrets

25  claim, it's not disputed by the other side that what is at

O6DVSECO

1    stake here are trade secrets.  We've spoken mostly about the

2    customer lists.  I now want to talk about the customer

3    database, the customer platform.  Having access to that

4    platform allows SAFE to see exactly what information we have

5    collected on each of those 12 million customers.

6              THE COURT:  Whose fault is that though?

7              MR. TABER:  Well, it's not our fault.

8              THE COURT:  Why not?  You gave them access.

9              MR. TABER:  No.  No.  I want to be really clear about

10   that.  We gave them access to what's called a Freemium account,

11   which allows them to see their own security rating and the

12   top-line security rating of up to five other customers.

13             What they did is they did a backdoor with shell

14   companies and with phony accounts that are really security SAFE

15   accounts to get in, in violation of our user agreement.

16   Because our user agreement says competitors cannot access the

17   site, and competitors cannot use information on the site for

18   purposes of going to build their own product or enhance their

19   own product.  That's right in our user agreement.  They can't

20   get on our site without clicking an "I agree to the user

21   agreement."  That's a requirement for access to the site.

22             THE COURT:  But if you allow them to go in and, by

23   going in -- let's say they use a fake name.  But they go in and

24   they have access to your entire database.  Then isn't that a

25   fault of insufficient security safeguards?

O6DVSECO

1          MR. TABER:  If they are a competitor, they are not

2     allowed to use a fake name so that they are not detected as a

3     competitor.  The competitor here, SAFE Security, when they went

4     in under their own name, was only allowed to get their own

5     information and top-line information on five companies.

6     Because that's all that you get.

7          THE COURT:  So but that's true of any entity, right?

8     So even if they used five names, they would have to use --

9     rather, five false names, they would have to use hundreds and

10    hundreds of false names in order to get access to --

11         MR. TABER:  No, no, no, no.  You can buy slots.  If

12    you're not a competitor, if you're a true customer, you can buy

13    slots.  You can buy ten slots or 100 slots or 1,000 slots or

14    any number of slots that you choose.

15         THE COURT:  And did they do that?

16         MR. TABER:  Yes, they did do that.  Mr. Cobb is the

17    guy who did the forensic work to detect what they did using

18    these phony -- and the only way we caught it, your Honor, is we

19    were able to match the IP addresses, that multi-number IP

20    address, back to SAFE.  You wouldn't do that in the ordinary

21    course unless you were engaged in a detective exercise, which

22    at that point we were because, as I said, there was an

23    investigation conducted because we believe they were gaining

24    access to information they weren't entitled to.

25         And here's the most important thing:  They don't deny

O6DVSECO

|  | in their papers that they did that; that they used phony names, |
|---|---|
| 1 | |
| 2 | phony websites, to get in and get information that they were |
| 3 | not entitled to get. |
| 4 | THE COURT:  They don't deny that? |
| 5 | MR. TABER:  There's no denial in their papers, your |
| 6 | Honor. |
| 7 | THE COURT:  Do you think they are going to admit that? |
| 8 | MR. TABER:  Well, we'll see when they get the |
| 9 | complaint -- when they answer the complaint.  They have the |
| 10 | complaint. |
| 11 | THE COURT:  We'll see what they say this afternoon. |
| 12 | MR. TABER:  I guess we'll see that this afternoon. |
| 13 | But in the papers they filed with your Honor the day |
| 14 | before yesterday at 11 o'clock at night, they don't deny that |
| 15 | they did that. |
| 16 | THE COURT:  Okay. |
| 17 | MR. TABER:  So we think we have a strong trade secrets |
| 18 | claim.  We think that on the breach of the user agreement, |
| 19 | strong claim for all the reasons I just said. |
| 20 | Tortious interference.  We don't have them as yet |
| 21 | recruiting people in violation of the employee nonsolicits, but |
| 22 | we know they are out there recruiting, and we're going to need |
| 23 | discovery to see if that's going on.  At this point, we're |
| 24 | simply asking that they be enjoined from tortious interference |
| 25 | with the contracts of all of the SecurityScorecard employees |

O6DVSECO

1   which contain one-year nonsolicit prohibitions.  In other

2   words, they can't say -- and they are now, I think it's four

3   employees from SecurityScorecard who have gone over to SAFE.

4   And we're not seeking noncompetes as to any of them; although

5   they actually all have noncompetes, we are not arguing

6   noncompetes here.

7         But as regards those four individuals, they can't use

8   those four individuals to go recruit all their friends back at

9   SecurityScorecard and try and bring them in.  And that's a

10  genuine threat.  Because Ms. Polyakova, among others, has put

11  on the internet that she's in the market to hire people.

12  That's fine.  She can hire whoever she wants.  But she can't go

13  back to SecurityScorecard and do that.

14        And I would note, your Honor, we got in the papers

15  from SAFE the other night, we got their standard policies,

16  their standard contract.  And like us, they have a one-year

17  employee nonsolicit.  Exactly the same.  We're just asking that

18  they be required to do what their own contract requires.

19        THE COURT:  Can she solicit people that you fired?

20        MR. TABER:  People who we fired is not a problem.

21        THE COURT:  Okay.

22        MR. EPNER:  Your Honor, can I just correct one thing

23  that's actually not --

24        THE COURT:  Let's let Mr. Taber finish, and then we

25  can get to the back table.  Okay?

O6DVSECO

1          MR. TABER:  I'm almost done, your Honor.

2          THE COURT:  Okay.

3          MR. TABER:  Balance of hardships.  There is no right,

4    I would submit, for them to use our stolen information, period.

5    So there's no hardship in enjoining them from using it.  And I

6    mentioned already we're not enforcing the noncompetes; so

7    concern that we were somehow or other depriving people of their

8    ability to earn a livelihood are untrue and not a factor here.

9          And finally, the public interest.  We would submit

10   that the public interest is strongly in favor of not letting

11   people download and take with them confidential information of

12   their employers and use it to their advantage.

13          THE COURT:  Thank you.

14          MR. TABER:  Thank you, your Honor.

15          MR. PADRO:  Your Honor, which would you like to hear

16   from first?  I represent SAFE, John Padro.  There are certain

17   types of allegations.  I'm happy to set the table a little bit

18   and then let --

19          THE COURT:  Okay.

20          MR. EPNER:  Mr. Padro, please proceed.

21          MR. PADRO:  Thank you.

22          So let's talk a little bit about where we are in this

23   case.  I think you've heard that they've raised -- that there

24   are at least three issues, and I'm going to talk on behalf of

25   SAFE, that they are seeking injunctive relief against SAFE.

O6DVSECO

1      I think what you will see when you look at the papers

2  that they've submitted, as well as we've put in in the reply,

3  that all they've been able to identify is some speculative harm

4  that they believe.  There is no evidence; there is no

5  indication of any of these things that have happened.

6      When Mr. Taber got up, first off, to talk about the

7  documents, no word in anything there did he say anything about

8  conduct that SAFE had done.  And instead, what you can tell

9  from the declaration submitted in our opposition is that we

10  never got the documents.  SAFE never received the documents,

11  never had it, it's never had access to these materials.  Yet

12  they still continue to maintain a request for injunctive relief

13  from us to those documents.

14      There is no irreparable harm, there can be no

15  irreparable harm from the fact that there was no real harm

16  here, your Honor.  And so I think that is the first point I

17  would like to establish.  And I think what we will see here is

18  a shifting sands approach from what the plaintiff has done.

19      THE COURT:  Did you hire Digital Mountain?

20      MR. PADRO:  Yes, we did.

21      THE COURT:  Where are the -- I guess the documents are

22  in a Google cloud.  But what can you tell me about your

23  client's ability to access the documents?

24      MR. PADRO:  Let me be clear.  Goodwin, as the lawyers,

25  has hired -- has got control of Iron Mountain -- sorry, I

O6DVSECO

1    should say Digital Mountain.

2           Can you repeat the question again?  Sorry, your Honor.

3           THE COURT:  What can you tell me about your client's

4    accessibility to the documents?

5           MR. PADRO:  No one at the client has any access to

6    these materials.  These are only under control of us through

7    Iron -- sorry, Digital Mountain.  Sorry.  Wrong mountain.

8           THE COURT:  Iron Mountain is the document --

9           MR. PADRO:  Correct.  Exactly.  I think this is maybe

10   a pun on that as Digital Mountain because they do the

11   forensics.

12          THE COURT:  I remember that from many years ago.

13          MR. PADRO:  Yes.  The short of which is — and to

14   Mr. Taber's point — had they had concerns about these

15   documents, they could have come to us.  We don't want these

16   materials; SAFE has never had these materials.  The sheer

17   reality is for what we've done in the five days that we've been

18   involved in this case is immediately try and remedy what the

19   concern is that they've raised.  And what's important here is

20   notwithstanding what we've done — and we think that is more

21   than sufficient to moot the issues — I would submit to you a

22   couple of things, your Honor.

23          First, it has nothing to do with whether SAFE had

24   access or whether there was any irreparable harm that is

25   attributable in any form to SAFE, okay.  This is all -- to the

extent they want to talk about Ms. Polyakova and what her past

role may have been and how those documents are, that obviously

can be answered by co-counsel over here as to those particular

allegations.

But you will see, if we go to the requests they've

sought, it is entirely overbroad.  And it's overbroad on

purpose.  Because I think what you can see is the real intent.

As Mr. Taber started to tell you, they are very

concerned about my client in this marketplace.  And what they

want this Court to do is to intervene and step -- put their

hands on the weights as to see who actually succeeds in the

marketplace.

And I think what you can tell by each of the harms

they are asking for — and I want to point out the flaws in each

of them and to show you what's happening.  They started in

their opening brief with the only allegation of irreparable

harm being the documents.  I can point you, if you would like,

your Honor, to those specific arguments.  But I think if you

look at pages 6, where they identify the irreparable harm, the

irreparable harm is the disclosure and potential use of those

documents and then the outreach to clients.  Nothing else is

alleged.  Okay.  So when Mr. Taber says, Hey, you didn't

respond to the other allegations, respectfully, your Honor, we

don't have to respond to the other allegations.  They can't

show any irreparable harm for anything else.  They haven't

O6DVSECO

1    alleged it, okay.

2          So this case began with a case of three documents that

3    Ms. Polyakova kept or didn't keep, I'll let her answer -- her

4    counsel will answer it, and inadvertently continued to have

5    them as she went on.  She didn't know about them, as the

6    declarations attest to and, most importantly, SAFE never knew

7    about them.  Until this case was filed, we had no understanding

8    of them, no awareness of them, we had never received them.  The

9    forensics shows we had never received them; that she had never

10   sent them to us, okay.

11         But I think the important part with all of this is you

12   require an evidentiary basis to find irreparable harm; it can't

13   just be wild speculation.  There's a reason why we hear so much

14   colorful language on what it is that's happened.  But what you

15   don't hear is evidence and facts.

16         THE COURT:  Mr. Taber indicated — and I don't want to

17   misquote him, so I'll try to be careful — that he would be okay

18   with a representation that only the attorneys, which is to say

19   you and Mr. Epner, would have either possession of or access to

20   the documents.  Isn't that the case now, as I understand what

21   you've said?

22         MR. PADRO:  It is absolutely the case now.  And that's

23   why we've represented and I had a conversation with Mr. Taber

24   saying look -- telling him what the likelihood was, and that

25   this was all moot; that there was no reason to continue on with

O6DVSECO

1    the injunction because the expectation or the imminent harm was

2    not existent, right.  It's in our possession.  It is under our

3    control.  If we wanted to have a further conversation about

4    some mutual arrangement to give him some comfort around that,

5    we're happy to do so.

6           THE COURT:  Did Mr. Lee destroy the documents?

7    Mr. Lee, he is the guy from Digital Mountain, right?

8           MR. PADRO:  Correct.  He has not done anything; it is

9    just being held in the environment as we have without

10   restricted access to everyone, pending obviously some guidance

11   from Mr. Taber as to how we would like to handle this and move

12   forward.  And when I raised this point, there was a discussion

13   to say, Well, look, we want all kinds of other things for

14   injunctive relief, and we're not going to find resolution on

15   that.

16           I think it is really important to say, Look, we

17   believe, A, first, that SAFE has no correlation or any

18   involvement with the injunctive issues on that first part.

19   Secondly, what they are seeking against SAFE is moot because

20   it's not actual and it's not imminent because of the measures

21   that have already been taken, okay.

22           And I think what's illustrative here is we put that in

23   our opposition; and what we got on our reply were brand-new

24   theories of irreparable harm.  Nothing was alleged in

25   irreparable harm beyond the document issues.

O6DVSECO

1          And I do want to point a really critical point.  When

2     we talked about the opening, there's the three documents, and

3     then there are kind of a number of "on information and belief"

4     allegations against what SAFE did with them.  One prominent one

5     is that we stole a customer, they claim.  They say based on

6     what we had, that this customer, Veralto, is a customer that

7     left plaintiff and came to SAFE.  That's a sworn declaration

8     from one of their president at a company saying that this was

9     the case.  And it actually turns out that wasn't the case.

10    That's the only supposed evidence they can identify.  And

11    again, that is kind of representative --

12          THE COURT:  It wasn't the case because?

13          MR. PADRO:  Because it's not a customer of SAFE.  They

14    claim in May that this company, Veralto, left the plaintiff.

15    It may have left the plaintiff, but it didn't go to SAFE and,

16    in any case, we didn't have the documents.  So how there is any

17    correlation or any basis to find real and immediate kind of

18    harm doesn't make any sense, your Honor.

19          So, look, I think the issues, when it comes to the

20    documents — subject, obviously, to what co-counsel will say —

21    have no bearing on SAFE; SAFE has no reason that there should

22    be an injunction.  To the extent Mr. Taber wants to talk about

23    what happens with the documents now, we're happy to have that

24    conversation.  But it is his burden to make a showing of

25    irreparable harm; it is his burden to show for these documents

O6DVSECO

1    that things that SAFE is going to do have to be there.  And

2    really there is no factual basis whatsoever, okay.

3            Now, I want to pivot a little bit.  So we put that out

4    there, clearly aware that they have some problems because there

5    are still other allegations, right.  That's not the totality of

6    the injunctive relief they look for.  They also asked us, as

7    you may be element three, which is to not breach the user

8    agreement.  That's the totality of the injunctive instruction

9    of what we have to do.  It also asks for the fourth, to not

10   tortiously interfere.

11           Now, Mr. Taber has kind of indicated, Hey, look, you

12   don't really respond to the allegations.  That's not what we

13   have to do at this point.  They are seeking injunctive relief.

14   They have to meet their burden.  That's an exceptional relief.

15           What I can tell you is in their opening papers, there

16   was no discussion about irreparable harm associated with either

17   one of those.  The discussion, if you count to page 8 of the

18   brief, what you tell see -- if you can, your Honor, I will

19   point this to you.  This is docket number 11, okay.  What I

20   will point you to originally is I mentioned earlier, I said,

21   Hey, look, what is the irreparable harm they allege here?  That

22   is on page 6 and 7.  At the very bottom here they identify two

23   irreparably harms.

24           First, it will be a misappropriation of the

25   confidential information and trade secrets.  And those are the

O6DVSECO

1    two documents -- or I should say there are actually three

2    documents, but they call them two categories.  And then the

3    solicitation based on that, okay.

4            Then we move on.

5            The first mention about access and these things about

6    bogus interviews you may have heard in passing, they are all

7    atmospherics.  If you go to page 8, you'll see those are first

8    mentioned --

9            THE COURT:  Go to what?

10           MR. PADRO:  Page 8.

11           THE COURT:  Okay.

12           MR. PADRO:  And you'll see it says, second paragraph:

13   The risk of use of the two documents — or three documents, I

14   should say — absent relief is attenuated by history.  That

15   doesn't mean that there's separate irreparable harm.  That's

16   not what they've said in any form.

17           So when Mr. Taber says, Well, look, I've got all

18   these --

19           THE COURT:  I'm sorry.  Did you say "attenuated"?  I

20   read "accentuated."

21           MR. PADRO:  Sorry.  Accentuated.  You're right.

22   Correct.

23           THE COURT:  Very different.

24           MR. PADRO:  That's correct.

25           And, your Honor, what I would submit is what we've had

O6DVSECO

1   here is a bait-and-switch.  They start with the documents they

2   thought were really kind of the smoking gun.  They probably

3   didn't do any diligence.  They should have reached out to us to

4   have a dialogue.  They don't.  Trying to cover what happens.

5           What do we get in the reply?  We get whole new

6   arguments about irreparable harm.  And what we get is they are

7   entirely legally deficient.  They are based in the same kind of

8   manner of what we saw originally, which is just speculation;

9   which is they will -- if we can, I will point you to those

10  allegations.  We are in docket number 42.  And this is, I

11  believe, on page 5, okay.  Starting there, they identify first

12  the disclosure or potential misuse of the documents, moving

13  into page 6.  And then on the bottom of -- on page 6, there's a

14  brand-new theory of irreparable harm.

15          THE COURT:  Did you say document 42?

16          MR. PADRO:  42 is what I have here.  Sorry, it's 44.

17  I'm corrected by co-counsel here.

18          THE COURT:  44, page 6.

19          MR. PADRO:  Page 6.  Okay?

20          You'll see -- starting on page 5, I should say.  They

21  identify a first harm, which is the documents, right; that the

22  trade secrets associated with them will be used or

23  misappropriated, okay?

24          THE COURT:  Yeah.

25          MR. PADRO:  Then we continue.  And for the first time

O6DVSECO

1    in the reply on page 6, we hear a brand-new theory or set of

2    theories, I should say, about other irreparably harms that were

3    never in their opening brief, okay.

4            And I want to point out there are serious issues with

5    what is alleged here, both from not only do we have less than a

6    week to respond, but now we have less than 24 hours to respond

7    to new allegations.

8            What I would say is there were two things, and these

9    both tie to the allegations they have in the injunctive relief

10   they have.  And I'll start with tortious interference, because

11   I think that is even more straightforward and it will

12   illustrate what it is.

13           If you look on page 7, for the first time they

14   indicate that there will be tortious interference from us

15   interfering with the nonsolicitation restrictive covenants.

16   Your Honor, that's not pled in their complaint.  That is not a

17   basis they've alleged.

18           If you go to their complaint, your Honor — and this is

19   docket number 1, where they allege tortious interference on

20   page 26 — the tortious interference they relate to is inducing

21   apparently Ms. Polyakova to breach her confidentiality

22   obligations.  This is quintessential bait-and-switch; and this

23   is the irreparable harm that they are trying to impose, the

24   extreme relief they are looking for, okay.

25           Now, I can also tell you that the allegations related

O6DVSECO

1      to tortious interference from even just having a day to look at

2      them don't hold up scrutiny.  They are not real.  They claim

3      that she had -- that Ms. Polyakova posted on LinkedIn and

4      indicated that she's looking to hire.  And their contention is

5      that violates her nonsolicitation.  She's publicly announcing a

6      job.  She is not soliciting; she's not targeting.  And there is

7      law that indicates that targeting somebody -- that solicitation

8      requires you to specifically target them.

9                  THE COURT:  Target a particular individual?

10                 MR. PADRO:  Correct.

11                 Because otherwise if you just publicly advertise the

12     post, how could that be a solicitation to a particular person?

13                 Now, again, look, this is raised for the first time in

14     the reply; so this isn't, frankly, in front of you or properly

15     in front of you, your Honor.

16                 The second thing I would also say beyond that is the

17     allegations they claim, to show tortious interference, there

18     actually has to be an intent to breach the agreement.  The

19     first time that we learned that there was a nonsolicitation

20     agreement for Ms. Polyakova was when they filed the complaint

21     and produced that agreement.  We didn't have that agreement

22     beforehand.  Wasn't present.  That was never given to us as

23     part of Ms. Polyakova's onboarding in any form.  So to the

24     extent that was a term she couldn't provide, we had no idea.

25                 THE COURT:  Was she obligated to provide it or was it

O6DVSECO

1    part of your --

2            MR. PADRO:  She was not obligated to provide it;

3    probably likely subject to concerns about confidentiality of a

4    third party.

5            THE COURT:  You can't talk over me.

6            MR. PADRO:  Sorry.  Apologies.

7            THE COURT:  Just because of the court reporter.

8            MR. PADRO:  Sure.

9            THE COURT:  One, did she have an obligation to turn it

10   over; and two, is it part of SAFE's policies and procedures to

11   ask during the onboarding process?

12           MR. PADRO:  And I will answer that.  I don't know the

13   exact facts.  What I can tell you are some related facts to

14   this, which is, one, we never received it.  I don't know if it

15   was asked for and not received; I assume there would have been

16   some concern, but again, this is just kind of my basis.

17           With regard to your question about policies, actually,

18   when Ms. Polyakova joined the company and when she accepted her

19   offer, was contingent on making sure she agrees and is bound by

20   whatever other obligations she has to third parties.  That was

21   specifically part of contingent to her employment, right.  And

22   when I spoke to Mr. Taber, I let him know that; that this was

23   an expectation as part of her agreement.  We were going to tell

24   the Court that, Look, when she signed it, she told us:  I am

25   going to comply with everything I have.  We had no knowledge

O6DVSECO

1    until they filed their complaint for the first time, okay.

2           And again, what I would suggest to you, your Honor, is

3    there is no irreparable harm; they can't show the facts.  Just

4    conclusively saying, Hey, look, this is going to cause

5    something is not a factual basis, is not a legal basis to

6    actually be able to sustain irreparable harm; nor is it likely

7    to sustain likelihood of success if you can't show any intent

8    to induce that breach.

9           Now, turning to the other allegation.  Going back now,

10   they also had a new theory with regard to the access, okay.  As

11   you may remember, when we talk about the opening brief, they

12   said the access just shows the ill intent that my client has

13   with regard to plaintiff.  That's what they said.  They don't

14   identify it as a separate irreparable harm.

15           THE COURT:  What access are we talking about?

16           MR. PADRO:  Access to their systems.

17           THE COURT:  Okay.

18           This is your client's use of false names to --

19           MR. PADRO:  Correct.

20           THE COURT:  Okay.

21           MR. PADRO:  Correct.

22           And what I would submit to your Honor is there was no

23   allegation about irreparable harm related to that in the

24   opening brief.  There is no separate panel or reasoning or

25   argument related to the access of documents or what they call

O6DVSECO

1    the breach of contract, okay.

2          And let me submit to you a little bit further here

3    that there is good reason, because they haven't substantiated

4    anything.

5          If you look at their rebuttal brief, which is page

6    DI -- or I should say docket entry 44, if you look, sorry, at

7    page 6 of this, moving into page 7, this is the first time

8    they've identified a supposed alleged irreparable harm

9    associated.  And what they identify is that, Hey, once you

10   access the portal, once we improve -- once SAFE improves its

11   products, we can't undo them.  That's the totality of their

12   allegations for irreparable harm.  There's no explanation of

13   what they saw in the system; there's no allegation of what SAFE

14   supposedly did with that information.

15          THE COURT:  Well, I think one of the things they say

16   was they saw your address, your IP address, in connection with

17   several new customers.  I don't know one or more --

18          MR. PADRO:  No.

19          THE COURT:  -- new customers, but what about that?

20          MR. PADRO:  Well, respectfully, your Honor, I've had a

21   week, and I haven't been able to get any real immediate answer

22   on what those facts are.  I would submit to, your Honor, that

23   supposedly before filing this, there was an entire forensic

24   analysis done.  None of that was provided to us.  We were told

25   instead — now, mind you — and again, this is why the context

O6DVSECO

|     |                                                                      |
| --- | -------------------------------------------------------------------- |
| 1   | is important — opening brief says nothing about irreparable          |
| 2   | harm when it comes to access; makes no allegation about this         |
| 3   | idea that, Hey, you looked at some McGuffin on our system, then      |
| 4   | you used that McGuffin to change our product in some --              |
| 5   | THE COURT:  You used that McGuffin?                                   |
| 6   | MR. PADRO:  McGuffin is -- let me say that McGuffin is               |
| 7   | kind of like -- we're going to go real tangent here.  But in an     |
| 8   | action movie, it's like the secret thing that somebody that         |
| 9   | they are all working around, but nobody knows what it is.  And      |
| 10  | so the idea -- let me reframe this so we get to a better place      |
| 11  | about it.                                                            |
| 12  | The short of what I'm saying here is there is no               |
| 13  | specific identification of what it is that they saw in there in     |
| 14  | any form.  What you have on page 6 to 7 in their reply brief is     |
| 15  | the totality of their allegation of what we saw; and, more          |
| 16  | importantly, what we did with that; and, more critically, how       |
| 17  | that caused harm, who knows, because it's not in here.              |
| 18  | And again, this goes to the same theory across the            |
| 19  | board about what they've been doing here with the injunctive        |
| 20  | relief is there's no substance behind what they're saying.  I       |
| 21  | think their position is, Well, we filed a complaint.  We think      |
| 22  | we've got enough of a basis.  That means we're also entitled to     |
| 23  | an injunction.  That's just not true.  You have to make a           |
| 24  | finding of actual irreparable harm, that that has been              |
| 25  | demonstrated, that this is real.  If I can't tell you what they     |

O6DVSECO

1    took, how they took it, what they did, how do you have a real

2    injury here, okay?

3           Now, the other thing I will say, how is it imminent?

4    We've told them in our opposition brief, you know, we're

5    looking into what you've said already; but, moreover, we've

6    instructed all of our employees to not access, okay.  So how is

7    there imminence?  What is what's next, whatever the

8    circumstance may be.

9           And I would kind of critically say even one step

10   further is there was no irreparable harm here.  And you don't

11   hear a lot about this from Mr. Taber.  But if you look about

12   the terms of use, there are specific restrictions and

13   indications of what the maximum amount of damages might be

14   associated with any breach of that contract.  If you look at

15   the terms of use as they've identified, terms 10.1 — if you

16   want, your Honor, I can point you to that.  This is an exhibit

17   to the Sachin Bansal declaration.  And this is -- as I have it,

18   this is docket entry 13-5.  And you'll see it says "End User

19   Saas Agreement" at the top.

20           THE COURT:  I don't have that.

21           MR. PADRO:  Okay.  But what I will represent to you,

22   your Honor, is that in the provisions 10.1 and 10.2, there are

23   specific quantifications of what the damages are for any breach

24   of contract or any tort relating to the terms of use.

25           So they claim there's a contract; and that we went

O6DVSECO

1    into it and did it in some -- their own agreement says we can

2    tell you what the damages are.  They're limited here.  They are

3    exactly spelled out.  And they did that for their own benefit.

4    But they can't now turn around and try and say something

5    different about it.  And when we talk about why does it matter

6    here, in addition to showing likelihood of success and what are

7    they actually pursuing here --

8            THE COURT:  What are the damages, by the way?

9            MR. PADRO:  Well, the damages are no more than, I

10   believe, 12 months of the fees for the last 12 months.  I'll

11   read it back to your Honor just so that it's clear.

12           Neither party's limited liability with respect to any

13   single incident or series of related incidents arising out of

14   or related to this agreement will exceed the amount paid by

15   customers hereunder in the 12 months preceding the incident or

16   series of incidents.

17           And there's some more qualifiers here.  But, your

18   Honor, I would say that's pretty easy to quantify.  That's not

19   irreparable if you, yourself, have agreed to that, okay?

20           Now, the other thing I would say, earlier on there

21   were suggestions — and we may even hear — that there was other

22   downstream injuries that they may want to collect from.  I will

23   tell you, the loss of profits, loss of goodwill is specifically

24   addressed in 10.2, which says there will be no liability at all

25   for the loss of goodwill or the loss of lost profits.

O6DVSECO

1     And respectfully, your Honor, again, there can't be

2     irreparable harm here where you can easily quantify what it is,

3     the amount of money that might be in play here.  That's the

4     maximum damages they are going to get, okay?

5     So what I would submit to your Honor is I want to pull

6     back the lens a little bit and say what's really happening

7     here?  Why are there so many holes in their allegations?  Why

8     is it in five days we can establish they don't have irreparable

9     harm, there's no likelihood of success?  The context really is

10    is they're very concerned about SAFE in the marketplace.  And

11    what they have tried to do — and you've heard bits and pieces

12    of this from Mr. Taber — is that they want this Court to come

13    and start to intervene in that competition.

14    And I think they maybe call it a Freudian slip, but if

15    you look at docket number 44, this is their reply brief, when

16    they get to the section, page 9, where they talk about the

17    balance of the equities and public interest, okay, the first

18    paragraph at page 9 ends with:  Yeah, there's no real problem

19    here, you know, with the master list or whatever is going to

20    happen.  But they end the line which says:  As long as SAFE can

21    demonstrate how it identified those prospects or customers on

22    its own, it faces no risk.

23    And what they want is a court here to intervene for

24    every customer they potentially lose to SAFE, to get in front

25    of here.  And that's why they're insistent about, I want to be

O6DVSECO

1    able to call you in on contempt of court, for this exact

2    purpose.  Because where they can't compete with us, what they

3    want to do is they want to go and have a court come in and

4    investigate every single thing and slow them down is, in

5    essence, what they want to do with our client.

6         And with respect, your Honor, the burden to try to

7    comply with an overbroad injunction, like they've proposed, is

8    substantial.  We're going to have to think about everything

9    that we do.  Is this going to end up in some form eventually

10   breaching the user agreement?  Who knows what that means

11   exactly.  Tortiously interfering with others' contracts.  Again

12   — and I want to point you to the specific relief they are

13   looking for in a second — none of that is -- that shows the

14   balance of hardship is in our favor.

15        And I think when we actually looked at what they've

16   alleged for irreparable harm, the document is sequestered.

17   We're happy to work out something with Mr. Taber as to

18   something to satisfy -- you know, the question is why wasn't it

19   destroyed?  Because we didn't want to destroy the facts before

20   we had a conversation with Mr. Taber.  That's just prudent

21   policy, to the extent we have another question about spoliation

22   or something of that form.  So what we did is we preserved

23   every single thing in its form, okay.  And that's what we did.

24   So we want to hear from Mr. Taber about how we can move

25   forward.  And the way to do that is in the ordinary course of a

O6DVSECO

1    case.

2                    THE COURT:  I'm sorry, is in what?

3                    MR. PADRO:  In the ordinary course of our case.

4              We're going to get into discovery.  They want these

5    files.  The immediate question is with regard to the injunctive

6    relief.  There's no basis for it.

7              And I do want to note a particularly pronounced

8    concern, which is if you look at the relief they've submitted

9    to your Honor, the request for -- and I'll direct you again --

10   I won't direct you to what they just -- maybe I will direct you

11   to what they just submitted.  I think you were handed a revised

12   proposed order on their behalf.

13                   THE COURT:  Document 49?

14                   MR. PADRO:  Yes.  Correct.  Okay.

15             Now, the only change here is they've changed some of

16   the wording on the first element, the first relief they're

17   seeking.  So hopefully we can understand how this will apply

18   more broadly, okay.

19             For element A, okay, they seek for defendants —

20   nonspecific in any form — to have an injunction preventing

21   using or disclosing the documents.  We've told them, from

22   SAFE's point of view, we're not using, we're not disclosing; we

23   don't have them.  How are we having an injunction for things

24   that we've never done, never had any part of, okay?

25             Now, the second part of this is they now added all

O6DVSECO

this language about -- what they originally had was other

confidential information and trade secrets, okay.  So vague as

to be no idea how to comply with that.  They clearly have wised

up and tried to say something different.  But I would submit,

your Honor, this definition they submitted just today is no

clearer, okay.  It still suffers the same defect.  And

critically, there is no basis to have an injunction against

SAFE.  Ms. Polyakova can talk about that particular item.

And I want to move on.  I'll skip B, because that's

Ms. Polyakova as to her items.

And then there are two more requests made of SAFE.

The first is that we are enjoined from breaching the

user agreement.  Again, we don't know what that means.  We

don't even have that agreement; that hasn't been provided to

us.  We don't know what even forensics evidence that they have

that they are hiding or not sharing with us with regard to this

allegation.  And again, Rule 65(d) is very clear that you can't

just say comply with the law.  And that's exactly what --

THE COURT:  Can't just say?

MR. PADRO:  Comply with the law.

THE COURT:  Okay.

MR. PADRO:  Right.

And I would submit -- and D is maybe the most

illustrative.  The same concept again, but you are enjoined

from tortiously interfering with her employment agreement and

O6DVSECO

1    anyone else.

2           And what I would submit to your Honor is we've already

3    seen the harm here, which is they started with one theory about

4    what tortious interference is that we took confidential or

5    induced her to disclose confidential information, which turns

6    out to be demonstrably false.  And now it's a new one, that

7    we're tortiously interfering by inducing her to breach her

8    nonsolicitation agreements.  And that's the exact problem.  We

9    can't have an injunction, an open-ended injunction here, that

10   has nothing to do, and then there is no legal basis for any

11   part of it.

12          So, your Honor, I think what we're really seeing here

13   is the context matters.  I think when you put all of these

14   specific allegations in place, you won't see specific conduct

15   about SAFE.  You won't see specific real harm, irreparable

16   harm, with regard to SAFE.  And I think we've laid it out in

17   detail in our opposition brief.  And I think the harm is real

18   to SAFE here in this circumstance of a very aggressive,

19   clearly, plaintiff here taking and trying to use the abuse here

20   of what they've gotten or tried to get an injunction to haul us

21   into court every other time they disagree with something we've

22   done in the marketplace.

23          THE COURT:  Okay.

24          Mr. Epner.

25          MR. EPNER:  Yes, your Honor.

O6DVSECO

1          Your Honor, you noted at the beginning that

2     plaintiff's counsel has used some very charged language; words

3     like "stolen" used over and over again.  "Stolen" has a very

4     specific meaning; it means something that was taken to deprive

5     somebody else of materials.  There is no world in which this

6     was stolen.  And if Mr. Taber doesn't know that, he should.

7          The most that happened here was that my client, in

8     order to do her job, caused materials to be downloaded into an

9     environment where she could get help.  And you've heard a lot

10    from Mr. Taber and their client representative about how, Oh,

11    she could have done this within the SSC environment.

12         And, your Honor, we were very careful in our

13    declaration to point out that the reason that Ms. Polyakova —

14    not "Mary"; I wouldn't call opposing counsel anything other

15    than Mr. Taber.  And I'm offended that he would call somebody a

16    liar and then use her first name.  But Ms. Polyakova --

17         THE COURT:  Not just by the first part of that?

18         MR. EPNER:  Your Honor, I had the great fortune in my

19    career to represent the United States as an assistant U.S.

20    Attorney.  In that entire time, I never once used a defendant's

21    first name.  It's a sign of disrespect.

22         Moving on.

23         We were very careful in Ms. Polyakova's declaration to

24    point out that she moved the materials in order to get -- with

25    regard to what they've called the master east list.  That she

O6DVSECO

1    moved it in order to be able to get the assistance of

2    Ms. Allgyre, her stepdaughter.  And, your Honor, it's very

3    clear — and I understand that this is new to you, it was new to

4    me — that it is difficult to manipulate and create the formulas

5    in order to balance the workloads.  Ms. Polyakova did not have

6    that ability.  Ms. Polyakova asked people at SSC in their tech

7    support group, they either didn't have the ability or didn't

8    have the time to do so.

9          Ms. Polyakova's stepdaughter did have that ability.

10   And Ms. Polyakova's stepdaughter on one occasion received

11   these -- access to these materials through a Google drive so

12   that she could create the formulas to do so.  There were other

13   instances where Ms. Polyakova had Ms. Allgyre come to the place

14   where the database was and do that work within the database.

15   In order to do her job, she provided access to Ms. Allgyre; and

16   Ms. Allgyre helped her.  And then my client did not access

17   these materials again after she put them back into the SSC

18   database.  And that is undisputed.

19         Now, I do want to point out this thing about

20   Mr. Salamanca.  To the extent that there's any fault there,

21   it's on me for trying to be too helpful to Mr. Taber.  While I

22   was still investigating, I told him that I had spoken to my

23   client, and that she believed that the people who had

24   authorized -- it was Mr. Salamanca and the other gentleman who

25   I named by name.  And those names are in the email that I sent.

O6DVSECO

1          As your Honor properly noted, those names are not in

2     the declaration.  And reason they are not in the declaration is

3     my client could not swear to them.  What she could swear to was

4     that she was authorized.  What she could swear to was that she

5     was authorized by the person who was currently supervising her.

6     And what she could swear to was that she was authorized by the

7     people who were demanding that she rebalance these workloads so

8     that SSC could get her best efforts.

9          Now, your Honor, one of the things that I put --

10         THE COURT:  Can I just ask you, because one of the

11    things that she says — and obviously I tried to read her

12    affidavit or affirmation very carefully.  At paragraph 6 -- I'm

13    sorry, paragraph 7 she writes:  My supervisors and colleagues

14    were aware that I was performing this work, as it was

15    well-known that this work could not be performed with an SSC's

16    Salesforce database, and required the use of Google

17    spreadsheets or Excel.

18         I am told now by plaintiffs that it could be done

19    within the database.

20         MR. EPNER:  Your Honor, Mr. Taber was economical with

21    the facts there.  What he said was accurate.  But what the

22    truth is in context is that the work couldn't be performed

23    within the Salesforce database; it had to be put into a

24    spreadsheet, either a Google spreadsheet or an Excel

25    spreadsheet.  It is true that there were Google -- there were

O6DVSECO

| | |
|---|---|
| 1 | Excel spreadsheets that were available.  It's not clear to me |
| 2 | whether or not the data could have been put into a Google |
| 3 | spreadsheet; there may have been a firewall.  But in order to |
| 4 | manipulate the data and create the formulas in order to |
| 5 | rebalance the workload, it couldn't be done in Salesforce, it |
| 6 | had to be put into an Excel spreadsheet.  That's precisely what |
| 7 | my client said, and that's precisely correct. |
| 8 | THE COURT:  But I guess I'm trying to understand, I |
| 9 | think what the plaintiffs are telling me is that she could have |
| 10 | done that within the environment of the computer system at |
| 11 | SecurityScorecard. |
| 12 | MR. EPNER:  Your Honor, a human being with those |
| 13 | capabilities might be able to do that within the environment at |
| 14 | SecurityScorecard.  My client did not have those abilities. |
| 15 | And my client reached out to find people with those abilities |
| 16 | at SecurityScorecard, and was told they were not available. |
| 17 | And in that context, she told people, I'm going to work with my |
| 18 | stepdaughter, Jillian Allgyre, in order to do this work which |
| 19 | is essential to being able to perform for SSC. |
| 20 | THE COURT:  Who is Jillian?  I know she's the |
| 21 | stepdaughter, but is she some sort of -- |
| 22 | MR. EPNER:  She's a college student at Ohio State, |
| 23 | your Honor. |
| 24 | THE COURT:  She's a college student. |
| 25 | MR. EPNER:  At Ohio State, yes, your Honor. |

O6DVSECO

```
 1            THE COURT:  Okay.  Go ahead.

 2            MR. EPNER:  Who happens to have abilities to work

 3    Excel and similar spreadsheets and create formulas.

 4            THE COURT:  Okay.

 5            MR. EPNER:  And we provided forensic proof that

 6    Ms. Polyakova did not share these documents.  We provided

 7    Ms. Allgyre's devices to Digital Mountain, and Digital Mountain

 8    has provided to your Honor sworn declarations that there is no

 9    evidence that Ms. Allgyre ever brought any of these documents

10    to her -- any of her devices.

11            Your Honor, they're refusing to take yes for an answer

12    because they want to punish my client by process.  And what I

13    mean by that -- and this is not in the declaration.  But as an

14    officer of the Court, I am representing to you that I have been

15    informed within the last 24 hours that just before this lawsuit

16    was filed, SSC had an all-hands meeting where they told their

17    people, Don't do anything with SAFE.  Don't talk to SAFE, don't

18    go to SAFE.  And you're going to see, we're going to file a

19    lawsuit against somebody who just left.  And you're going to

20    see what happens to somebody who does that, and you wouldn't

21    want to be her.  This is punishment by process.  That's what's

22    going on here.

23            Your Honor, I'd like to turn to a few other issues,

24    unless you have more questions about that first database.

25            THE COURT:  Go ahead.
```

O6DVSECO

1          MR. EPNER:  With regard to the CISO list, the only

2     thing that is untrue about it is Mr. Taber, in his brief —

3     which I guess he's now retracted at least in part — called my

4     client a liar.  She did not access these databases after the

5     dates on which she said she stopped accessing them.  The only

6     people, according to the forensics that are in front of you in

7     the supplemental declaration of Mr. Lee, who accessed

8     afterwards are employees of SSC.  This is the person who kills

9     his parents and then asks for mercy as an orphan.  This is

10     entirely inappropriate.

11          And you've heard that these materials could have been

12     shared with OnSpring within the database of SSC.  That's, on

13     its face, ridiculous.  The whole point of a firewall was that

14     OnSpring did not have access to those documents.  And the best

15     proof of that, your Honor, if you take a look at Exhibits 1 and

16     Exhibit 2 to the Lee declaration — and I'm confident that this

17     does not disclose any confidential information in itself — it

18     says:  Use this one.  Can be shareable outside the company 424,

19     so forth.

20          These were two dinners that were being set up for

21     joint marketing by SSC and OnSpring.  And the purpose declared

22     during a conference call was we need to get this data to

23     OnSpring so we can divvy up the work of inviting people and

24     following up.  Now, they can call my client a liar, but that

25     just means that they're intemperate in their words.  There is

O6DVSECO

1     no fact behind it.

2          Now, your Honor -- and I apologize, I should not have

3     done so, but when Mr. Taber made statements about what is in

4     their employment agreement, not going to call him a liar, I'm

5     just going to say he was ignorant of what was actually in

6     there.

7          Your Honor, I refer you to document 1-2, page 3 of 10.

8     Mr. Taber represented two things:  Number one, that there was a

9     one-year lockup on solicitation and competition; and number

10    two, in response to a question from your Honor, Mr. Taber said,

11    Oh, and that noncompete doesn't apply if somebody has been

12    terminated by the company.

13          Your Honor, I'm going to read the first sentence of

14    the noncompete:  I agree that during my employment and for a

15    period of two (2) years following the termination of my

16    employment with the company for any reason, I will not,

17    directly or indirectly, own, manage, operate, control, or

18    participate in the ownership, management, or control of, or be

19    connected as an officer, employee, partner, director,

20    consultant or otherwise, or have any financial interest in or

21    assist anyone else in the world in the conduct of any entity or

22    business that competes with the Business.

23          There is no carve-out for people that SSC fires and

24    leaves on the side of the road.  And it's not for one year,

25    it's for two.  And this is the employment agreement that they

O6DVSECO

are asking that you grant injunctive relief, saying nobody will

tortiously interfere with that, nobody will breach any

obligations under it.  It is the same two-year period for

nonsolicitation.

Your Honor, as you saw in the documents that were

provided to you in support of my initial letter brief,

Mr. Taber himself admitted that no court in the world would

grant injunctive relief that precluded somebody from using

preexisting knowledge after they left the company.  The order

that they have put in front of you for your honor to sign and

put the full force of the United States government behind,

including, as Mr. Taber has said, the fear of being hauled into

court for contempt of court, does not include a carve-out for

preexisting knowledge.  It does not include many necessary

carve-outs in order for any court to enforce it.

Your Honor, I am absolutely certain of one thing:  My

client came to this with a pure heart.  She did her best for

SSC while she was an SSC employee.  She had no idea she was

going to get fired until she was fired.  After she was fired,

she took a series of weeks, and then she looked for a new job.

She got a new job.  She never told her new employer that she

had access to these materials.  She never provided them, those

materials.  She had no intent to ever look at them again.  She

frankly didn't even realize at some level that she still had

access.  And as soon as it was brought to her attention, what

O6DVSECO

1    we did immediately was put them beyond her control, something

2    she is only too happy to do.

3         Your Honor, I respectfully request that you deny this

4    overbroad, inappropriate, punishment by process request for

5    injunctive relief.

6         THE COURT:  Before we hear from the lawyers anymore,

7    let me ask this:  It seems like there might be a way to take me

8    out of this.  And no one would love that more than me.  Because

9    it appears as though, to the extent that Mr. Padro and

10   Mr. Epner have offered, that there is no reason why plaintiff

11   should not be amenable to a stipulation concerning the

12   safeguarding or even destruction of the documents.  The

13   representations have been made by gentlemen that are members of

14   the bar of this Court, that the documents are -- have been

15   turned over; that Ms. Polyakova no longer has access to them;

16   that they are being constrained in a way that no one has access

17   to them except perhaps the lawyers and Mr. Lee of Digital

18   Mountain.  There is the supposition that Ms. Polyakova could

19   have done something else with the documents prior to the time;

20   they could have been put in a Dropbox or a Box or a drop.  But

21   as I stand here, that appears to be speculation.

22        And therefore, I think it would make sense, Mr. Taber,

23   unless you are insisting on not having that conversation, that

24   that conversation take place, and that the defendants make

25   representations to you along the lines that I believe you

O6DVSECO

1    started on, that you want those documents either destroyed or,

2    you know, that there be some representations concerning where

3    they are, who has access.

4         MR. TABER:  The short answer, your Honor, is it could

5    be done provided that the end product of that, that

6    stipulation, is so-ordered by the Court.  And I said those very

7    words to Mr. Epner the first time he called me.  I'm still

8    saying those words.  That piece of it can be handled by a

9    so-ordered stipulation that says -- I'll lay it out.  Number

10   one, that all copies of these materials have been destroyed

11   except for, number two, the copies that are in the possession

12   of the lawyers for purposes of litigating the case; and number

13   three, that there's a representation by both SAFE and by Ms.

14   Polyakova that there are no other copies extant of these

15   documents; and that all of that is so-ordered by the Court.

16        That would not be difficult and would solve part of

17   why we're here.  Because in my world, a so-ordered by the Court

18   is, in effect, an injunction that comes with contempt of court

19   if, in fact, it's not true.  And so that we would be able to

20   live with as it relates to those documents.

21        THE COURT:  Okay.

22        MR. TABER:  I have a lot to say about other pieces,

23   and quite a lot has been said here, and I'd like the Court's

24   indulgence to respond to it.  Among other things, there haven't

25   been a mention of the law here yet, and I'd like to share with

O6DVSECO

1    the Court what I believe is the operative law here,

2    particularly as it relates to irreparable injury.  Because

3    there's been, I think, a gross mischaracterization by Mr. Padro

4    in particular about that.  I'd like to address that.

5            We do need, I believe — because I haven't heard any

6    inkling of consent — injunctive relief that keeps them off of

7    our customer portal and stops them from masquerading in ways

8    that we might not detect for months or years as people who they

9    are not in order to go on to that customer portal.  And we do

10   need injunctive relief to enforce the contracts.

11           I was very surprised to hear somebody say — I think I

12   heard them say — they didn't know what the contracts were.

13   That's not true.  Because we have correspondence from the

14   Goodwin firm with respect to the contract of another one of the

15   people that they hired that they were commenting on.  They have

16   the standard SecurityScorecard contract, they've had it for

17   some time.  And if they didn't have it before or didn't realize

18   they had it before, they have it now in these papers.  But we

19   cannot have them interfering with the nonsolicit process.

20           I think, with all due respect, Mr. Epner is confused

21   between nonsolicits and noncompetes.  We're not enforcing the

22   noncompete.  The language he read you about a noncompete that

23   applies for two years to somebody who has -- regardless of the

24   circumstances under which they left the company, is completely

25   irrelevant.  That's not what we're talking about.  We're

O6DVSECO

1   talking about a nonsolicit of employees by people who are no

2   longer at the company.

3          And your Honor asked me appropriately, did that mean

4   they couldn't solicit people who were no longer at

5   SecurityScorecard; and I said no, that's not within the ambit

6   of the noncompete.  I think Mr. Epner got confused and

7   thought -- not within the ambit of the nonsolicit.  I think

8   Mr. Epner got confused and thought I was talking about the

9   noncompete.  I'm not.  But we have to address, for injunctive

10  purposes, the customer platform and interference -- tortious

11  interference with the contracts.

12         The document piece of it, I think your Honor is

13  correct, I thought that proposition was correct from the very

14  beginning.

15         There was another comment, I think, from Mr. Padro

16  that the language in the proposed order that we gave you

17  defining the term "proprietary materials" was unintelligible.

18  That wasn't his word, but it was -- in effect, it was

19  unintelligible.

20              THE COURT:  Overly broad.

21              MR. TABER:  Overly broad.

22         We lifted it verbatim from the SAFE employment

23  agreement that Ms. Polyakova signed, and it's attached to the

24  papers.  Because I didn't want to have a fight about that

25  language.  We just took their language verbatim and put that

O6DVSECO

1    into the proposed order here, and that would be part of the

2    proposed stipulation as well.

3         I'm willing to give that piece of it a shot.  I do

4    think we have to deal with the other injunctive pieces.  And

5    I'd like to address those when your Honor is ready for me to do

6    so.

7         THE COURT:  Let me ask you about the purported

8    violation by SAFE of basically sneaking into your systems, and

9    I apologize for the nontechnical term --

10        MR. TABER:  It's as good as any.

11        THE COURT:  -- that I use.

12        Why can't you just -- I mean you've identified them or

13   you think you've identified one or more.  Why can't you just

14   shut them down?

15        MR. TABER:  The ones that we caught, we have shut

16   down.  They are all shut down.  What we can't stop is if they

17   get somebody else now, as they did previously, who is

18   affiliated with them, who we don't know is affiliated with

19   them, who has an IP address that we don't recognize, brand-new

20   IP address.  We can't stop that.  We might catch it eventually.

21   If we do the detective work that we did this time, we might

22   catch them.

23        But it's very easy -- Mr. Cobb can explain it better

24   than I can, because I'm not technical.  But it's very easy from

25   another address for somebody affiliated with SAFE who doesn't

O6DVSECO

1    have the name SAFE and we don't recognize as affiliated with

2    SAFE, to sign up for the service and give all that information

3    over to SAFE.  It's not difficult to do, but they need to be

4    enjoined from doing that because that's the deal.  They can't

5    be there.

6                THE COURT:  Mr. Padro.

7                MR. PADRO:  Yes, just a couple of points, your Honor.

8                To the overall framing, I think this is the same

9    discussion I had with Mr. Taber.  I said, Hey, look, with

10   regard to the documents, I think we can reach some agreement as

11   to what's happening to them.  And where the conversation

12   immediately turned was, We are still pursuing all the other

13   injunctive relief.  And I went through and I had the

14   conversation with him.

15               I said, Well, when you asked for the documents, what

16   else do you need shielded, protected, whatever form?  You

17   have —— in your injunctive relief you are looking for other

18   trade secret and confidential material with no specificity.

19               There was no further discussion as to what it might

20   have been; there's nothing in their briefing.  And I think what

21   I would submit to your Honor is, look, if we can get to a point

22   where that is the only issue that needs to be addressed, I

23   think the parties can resolve that.  I think the remainder of

24   injunctive relief they are looking for has to be denied.  I

25   think there is no legal basis for what there is.

O6DVSECO

1          THE COURT:  I want you to specify what it is that

2    you're talking about.

3          So you're no longer talking about the documents.

4          MR. PADRO:  We're not talking about documents.

5          THE COURT:  Let me ask you this:  Based on the way

6    that he framed it, would you be willing to enter into a

7    stipulation?  It would be so-ordered by the Court with respect

8    to the documents.

9          MR. PADRO:  I think with respect to the documents,

10   obviously talking about the representations and being able to

11   agree on those in terms of what it is that we have or doesn't,

12   yes, I believe so.  We need to see the details, but I don't see

13   any concern, listening to what I've now heard right now with

14   regard to the documents.

15         THE COURT:  Okay.

16         MR. PADRO:  What it talks to about beyond the

17   documents, about these vague categories of trade secrets and

18   confidential information, which is what Mr. Taber tried to add

19   on to his statement beyond the documents.  So there are the

20   three documents that we've talked about; that's what they've

21   alleged, that's what they've identified, that's what remedial

22   measures we've already taken.

23         There is another bucket in the first element of their

24   request for relief, which is a general category of trade

25   secrets and confidential information.

O6DVSECO

1          THE COURT:  Can I just be as straight as I possibly

2     can.  He's saying that you are directly and by proxy entering

3     into client agreements with SecurityScorecard, and going into

4     their systems and rooting around and looking at stuff that you

5     shouldn't be looking at.

6          You didn't make any representation about that, that

7     you're not doing that, and I'm not going to force you to make a

8     representation if you're not prepared to do so.  But, you know,

9     that seems to me to be not good.

10         MR. PADRO:  Respectfully, your Honor, I would admit

11    we've had five days with the materials.  And as I mentioned,

12    whatever forensics analysis they've done, it hasn't been shared

13    with us.  And what I would submit, your Honor, is we'll get a

14    chance to respond to that as part of discovery.

15         But what I can tell you is there is no legal basis for

16    the injunctive relief they are looking for.  You're going to

17    have to put a finding out there that says "what is the

18    irreparable harm here."  They can't even identify what was

19    taken; they can't tell you what somebody looked at; they can't

20    tell you what somebody did with it.  They just say vaguely,

21    Hey, we were able to improve our products faster.

22         THE COURT:  I don't even know they say that.

23         But what they do say is they say, Our agreements

24    require you to represent that you are not a competitor; and

25    that, you know, you will only use this database in a way that

O6DVSECO

1    this agreement or this contract allows.

2            You broke the first part of that because you are a

3    competitor and you went in there by some trick that you entered

4    into a contract.  So they've alleged that.

5            Why isn't that sufficiently specific?

6            MR. PADRO:  I don't know how that is irreparable harm,

7    right.  Irreparable harm is not just a colorable claim for

8    breach of contract, right.  What he's asking you to do is just

9    say, well, we've pled the elements of a claim.  But they have

10   to show a real imminent irreparable harm.  And as I think I

11   represented to you earlier, all three of those they fail at,

12   right.  They are allegations, when it comes to how this is a

13   real harm, are entirely conclusory.

14           If they had this very detailed forensic analysis done

15   about what was done and what they saw, why hasn't any of that

16   been presented?  That's what they have to do to prove

17   irreparable harm.  There has to be some actual evidence to

18   demonstrate that something happened.  Just having Mr. Taber get

19   up there and say, Hey, look, this is what we think could have

20   been happening, I have no way to test whether that's true or

21   not; because, you know what, it hasn't been disclosed to me.

22           THE COURT:  Okay.

23           MR. TABER:  That's incorrect, your Honor.

24           Paragraphs 40 to 45 of Mr. Bansal's declaration spell

25   out exactly what they did, who did it, using what IP addresses.

O6DVSECO

1    These are their people; they can go look and see what they did.

2         We actually know that they engaged in heavy-duty use

3    of the system, looking at hundreds of scores and details with

4    respect to hundreds of portals.  And the person who did that

5    analysis is two seats to my right.

6         THE COURT:  Let me ask you this:  I believe Mr. Padro

7    also said in his earlier comments, even if true, the damages

8    are defined and limited in those very contracts.

9         MR. TABER:  Monetary damages, your Honor.  There is a

10   clause, I don't think it applies, frankly, to compensatory

11   damages.  But today is not about damages; today is about

12   injunctive relief.  And if your Honor takes a look at a case

13   called *Muze* from the Southern District of New York in 2000, it

14   says quite clearly that accessing somebody's database to

15   rummage around in the way that they did here is irreparable

16   harm.

17        Why?  Because the reason they are in there doing that

18   is so that they can improve their products as against ours.  So

19   they can look at what information has SecurityScorecard managed

20   to collect about General Motors, and do we have the same

21   information.  How are we deficient?  What are they missing?

22   That gives them a competitive edge in improving their system.

23        And it's irreparable injury because when they improve

24   their system, A, we'll never know that that's what they did;

25   and B, once improved, how do we unscramble that egg?  It can't

O6DVSECO

be done.  Which is why the very notion of allowing them to

rummage around in our data, when they are not allowed to be

there, and expressly execute a user agreement that says they

can't be there as a competitor, is wrong and it should be

enjoined.  That's one aspect of irreparable injury.

Your Honor, I want to talk more broadly, if I can,

about irreparable injury.  Because in this district — and I'm

referring now to a case called *Hello Logistics* from 2023 —

irreparable harm is presumed when trade secrets are

misappropriated.  Presumed.

What does it mean for trade secrets to be

misappropriated?  Under the Defend Trade Secrets Act, there are

three ways, one of which is plainly what has happened here, and

that is the acquisition of the trade secret.

Now, there are two other ways, disclosure or use of

the trade secret.  And they may have done that too, we don't

know.  But we do know, as we sit here today, that they acquired

our trade secrets.  They acquired the lists that Ms. Polyakova

took, whether innocently or not.  I don't believe we've heard

an explanation of innocence.  I still don't think we've heard

who was the supervisor who approved it.  I don't think any

supervisor did approve it.  And believe me, we talked to the

current supervisor too.  And he says, Not only didn't I approve

it, I never would have approved it.  That's not the kind of

thing -- we don't let people take things out of the company,

O6DVSECO

1    especially not customer lists.

2            I don't know at this point what their new explanation

3    is.  I do know when I spoke with Mr. Epner he gave me the two

4    names of people who aren't there.  That's who he told me the

5    supervisors were.  Now we're getting a different story.  All of

6    that will get fleshed out in discovery.

7            But the fact of the matter is I don't have to prove

8    anything more than they have acquired — acquisition under the

9    DTSA — the trade secrets, to now have -- that's a

10   misappropriation.  And misappropriation under the *Hello*

11   *Logistics* case — and there are a lot of other cases it cites —

12   is presumed -- irreparable harm is presumed upon such

13   misappropriation.

14           It is also the case, your Honor, that when customer

15   relationships are threatened, that's irreparable harm.  And if

16   they have our customer list -- and I get it, they are up, down,

17   and situation disavowing that they have it.  And now apparently

18   maybe we'll be enter into a stipulation that they'll never get

19   it.  But when we walked into the courtroom today, I had no such

20   stipulation.  And when I spoke with Mr. Epner about such a

21   stipulation, he wouldn't enter it because he said, Your

22   definition of "confidential information" is too broad.

23           MR. EPNER:  Your Honor, can I respond to that, please?

24           THE COURT:  No.

25           MR. TABER:  So, your Honor, when we got their

O6DVSECO

1    opposition papers and I saw the definition of "proprietary

2    information" in their contract, I lifted it verbatim, and

3    that's what we're using.  And now for a second time I just

4    heard Mr. Padro say the definition is inadequate.  I don't get

5    that.  It's his client's own definition.

6         And yes, we don't know what else Ms. Polyakova took.

7    We don't know what other information she has.  So I can't live

8    with a solution here.  Now that I know she's willing to email

9    her stuff things from the company, we have to protect any of

10   the proprietary information she took.  That may be the null

11   set, and that would be wonderful.  But an injunction against

12   her that says, Thou shalt not use any proprietary information,

13   define the way SAFE says it, there's nothing unlawful about

14   that at all.  And it's more than justified on the facts here,

15   now that we know that she's taken what she has taken.

16             THE COURT:  Mr. Padro?

17             MR. PADRO:  A few quick points here, your Honor.

18             First, I would say, what you hear from counsel here is

19   a lot of mixing and matching.  We're talking, again, about the

20   documents, when he talks about a presumption of irreparable

21   harm.  What you don't hear is anything about irreparable harm

22   when it comes to this access.  And I think that's where the

23   mixing and matching --

24             THE COURT:  Well, no.  What he said was that mere

25   access is irreparable harm.

O6DVSECO

1          MR. PADRO:  Correct.

2          THE COURT:  I don't know if that's right.

3          MR. TABER:  That's the *Muze* case, your Honor, that I

4     cited.

5          THE COURT:  Correct.

6          MR. PADRO:  If I could quickly respond to that.

7          What he's talking about the presumption, he's talking

8     about trade secrets.  There have been no other trade secrets

9     allegedly identified.  We don't have an issue later talking

10    about whether the documents themselves that they've identified

11    are trade secrets, but there's nothing else identified.

12         You have to make out a claim for trade secret; you

13    have to identify what that trade secret is.  What is the trade

14    secret in their system that they claim to have in it?  What is

15    it?  I don't know.  I can't respond to it.  Because, guess

16    what, it's not been identified.  And Rule 65(d) is really clear

17    you.  Just can't say, Hey, don't use my trade secrets.  You

18    have to make very clear — there's case law around this in our

19    briefing — that you have to specify what those trade secrets

20    are.

21         And I think this all highlights the point about

22    irreparable harm about the access is it's all speculative.  It

23    is, You guys did something inside of our system.  We won't tell

24    you what it is; we won't tell you how you used it.  And by the

25    way, Judge, we want you to just give us an overbroad

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O6DVSECO

1    injunction.  Just comply with the law.  Just don't use trade

2    secrets.

3              THE COURT:  Did you finish?

4              MR. PADRO:  One last point, if I could, on the *Muze*

5    case.

6              I think the *Muze* case is distinguishable for a variety

7    of reasons.  But I think what you will see when you look at

8    *Muze*, when they talk about irreparable harm, there's actual

9    evidence of harm.  When you read that case, the allegations

10    there show what somebody did, what they accessed; and then

11    critically, they also said somebody did something with that.

12    And that's why a court found irreparable harm, because that's

13    what's needed to sustain the extraordinary relief that they are

14    looking for here.

15              None of that is present here.  None of that is

16    present.  There's nothing imminent.  And frankly, your Honor,

17    there's no basis to that part of it.

18              And so what I submit to the Court is the pathway

19    forward is let's have a discussion about let's get a

20    stipulation on the documents so we can find a way to move

21    forward with the case of the discovery.  But the remainder of

22    the injunctive relief should be denied.  If they want to pursue

23    discovery as this case goes on and they actually want to

24    articulate a theory, as we have, what they shouldn't do is

25    get -- just because they think they pled enough, that that is a

O6DVSECO

1   basis for injunctive relief, because that's not the law.

2            THE COURT:  Mr. Epner.

3            MR. EPNER:  Yes, your Honor.

4            I'm going to pass over — and I apologize for breaking

5   in — the statement by Mr. Taber about whether or not he was

6   previously told that my client was ready to stipulate to having

7   zero future access and having it so-ordered with regard to the

8   documents.  Your Honor has the emails that went back and forth.

9   Your Honor, I am quite confident I can put myself in your hands

10  and I have no concerns.

11           Your Honor, there's a reason why I separately

12  represent my client from the company.  And that's because my

13  client has separate interests from the company.  And the fact

14  that Mr. Taber keeps saying, Oh, just use this language that we

15  took from the SAFE agreement, your Honor, Mr. Taber himself

16  admitted that no court in the world would enforce an injunction

17  that failed to carve out preexisting knowledge of a person.

18           THE COURT:  But I think Mr. Taber also said that

19  aspect of the noncompete is --

20           MR. EPNER:  No, no, this isn't about the noncompete.

21  This is about the definition of "proprietary information."

22           My client had eleven years of experience in this

23  field; her own contacts, her own people, who she knew who to go

24  to.  It's what they hired her for.  And now the definition that

25  they are using of "proprietary information" would say

O6DVSECO

1    everything that she had --

2                THE COURT:  Could I just stop you for a second.

3                Mr. Epner -- I'm sorry, Mr. Taber, did I understand

4    you to say that the only aspect of the agreement that she had

5    with SecurityScorecard is the nonpoaching aspect of it?

6                MR. TABER:  Yes.  The noncompete is off the table and

7    has been, as I told Mr. Epner three days ago, four days ago.

8                What I think he's quarreling about — and I don't,

9    frankly, understand it because the language we propose

10   addresses it — is we are asking for an injunction that says she

11   can't use any other proprietary information she has.

12               MR. EPNER:  But the definition of "proprietary" --

13               MR. TABER:  Please.

14               MR. EPNER:  Your Honor, please, I'm begging you.

15   Because Mr. Taber is obfuscating.

16               The definition of "proprietary information" that my

17   client is not allowed to use to solicit customers does not have

18   a carve-out for the information that she had in her head about

19   customers on the day she started working for SSC.  I've pointed

20   that out to him five times.  He's always agreed that that's

21   unenforceable, and he's never put it into his proposed order.

22   It's still not there.  His only excuse is, Well, that's the

23   language she agreed to from SAFE.

24               MR. TABER:  No.  Your Honor, I don't understand why he

25   can't read what's literally --

O6DVSECO

1          MR. EPNER:  I can read, Mr. Taber.

2          MR. TABER:  Clause A refers in the definition of

3     "proprietary information" to information "she developed,

4     learned or obtained during the term of her employment."  The

5     stuff that she knew beforehand isn't included.  It's right

6     there in black and white.  So I'm not sure what his problem

7     with that -- and again, that's the language from her existing

8     contract that she signed with SAFE a month ago when she joined

9     SAFE.  So that's how we decided to define it, to get around all

10    of the problems that he was raising with me.

11         One other thing, your Honor --

12         MR. EPNER:  Your Honor, can I speak to that?  Because

13    there's still a problem.

14         MR. TABER:  I wish you'd just let me finish, because I

15    have other points to respond to what he said and we're just

16    going down a rabbit hole.

17         Your Honor, he said something that was very troubling

18    to me, and it was sort of the centerpiece of his argument about

19    punishment by process that my client put out something, said

20    something about there being Mary -- I'm sorry, Ms. Polyakova

21    would be made an example of, and that that's the whole reason

22    for this litigation.  So I furiously texted my client and I'll

23    read you the exchange.

24         Mary's counsel --

25         MR. EPNER:  Is this a waiver of privilege?  Is this a

O6DVSECO

1    waiver of privilege, your Honor?

2            THE COURT:  I don't know.

3            MR. EPNER:  Your Honor, before he says it out loud,

4    I'd like a representation about whether or not this is a waiver

5    of privilege on all communications with his client on the topic

6    of today's injunctive hearing.  To the extent it is, fine; to

7    the extent it isn't, your Honor, I respectfully suggest it's

8    not appropriate for him to read.

9            MR. TABER:  Your Honor, he made a representation to

10   the Court that something occurred.  I sent my client the

11   following text:  Mary's counsel just said — I'm sorry for using

12   her first name, but that's -- her last name is a long name and

13   we haven't done very well with it.  Ms. Polyakova's counsel

14   just said that right before this lawsuit started, there was an

15   all-hands meeting at SSC announcing the lawsuit and telling

16   people "This is what will happen if you do what Mary did."

17   True?

18           He responded:  No, not true.

19           He then shared with me — and at some point I suspect

20   in discovery it will be -- it will be shared — the

21   communication that went out advising people of the lawsuit,

22   giving them a link to the filing.  That's what happened.

23           This notion that people were told that there's going

24   to be an example made of somebody through this litigation is a

25   falsehood.  I don't understand how Mr. Epner can claim to know

O6DVSECO

1    it, because obviously he wasn't present.  He's got it on second

2    or thirdhand, maybe his client told him, but she wasn't there

3    either, from somebody else.  I don't know.

4           But I can't leave that record with the suggestion that

5    this is somehow or other a make-an-example-of lawsuit.  Far

6    from it.  This is a lawsuit about somebody who admittedly has

7    information she shouldn't have.

8           We're now all trying to figure out how to put the

9    genie back in the bottle, okay.  There are ways to put the

10   genie back in the bottle, and from day one we've been amenable

11   to that.  We've even gone so far as to say, Let's put the genie

12   back in the bottle using the contractual regulatory language

13   drafted by SAFE itself to define what has to be put back in the

14   bottle.  But it has to be put back in the bottle.  And New York

15   case law and Southern District case law is clear that

16   irreparable harm is presumed when this kind of trade secret

17   information -- and you haven't heard anybody on the other side

18   there say it's not trade secret information.  Nobody has said

19   that.

20          THE COURT:  Mr. Padro says, What's the trade secret?

21   Define the trade secret.  And I think he's right.  I mean, I

22   think for you to come in here and say they've taken our trade

23   secrets and enjoin them from doing so, you have to tell me what

24   it is.

25          MR. TABER:  And your Honor, I overgeneralized.

O6DVSECO

1          What they have not denied is that the customer list

2     that she took and the prospect list that she took are trade

3     secrets.  So that's established.  Nobody has said on the other

4     side those aren't trade secrets.  And the law is, frankly,

5     overwhelming that those are trade secrets.

6          Now the question is, as I said, how do we put the

7     genie back in the bottle.  With respect to those specific

8     documents, it sounds like there's a path forward.  With respect

9     to whatever other trade secrets she may have taken, because we

10    now know this is an individual who feels authorized — I'll use

11    that word — to send things to her personal email from the

12    company, whatever else she sent, we don't know.  We only know

13    what we found, but we don't know.  People can put things on

14    thumb drives and walk out the door.  We don't know what she has

15    or not.

16          THE COURT:  But now, Mr. Taber, we're clearly in the

17    realm of speculation.

18          MR. TABER:  Absolutely.

19          But I would say, your Honor, it is commonplace in this

20    district to -- and I myself have had cases where we have

21    secured on the basis of proof that somebody has taken an item

22    that is a trade secret a general injunction, especially with an

23    employee who has a confidentiality obligation in their

24    contract, which Ms. Polyakova had.  We get an injunction that

25    says:  Thou shalt not, in accordance with your contractual

O6DVSECO

1   obligations and the Defend Trade Secrets Act, use any other

2   trade secrets.

3          And then the question becomes, Okay, what's the

4   definition of "trade secrets"?  That's the place where actually

5   I went to their contract for their definition, and that's what

6   we put in the proposed order, so that it wouldn't be subject to

7   an attack as being vague or overbroad or what have you.

8          THE COURT:  I'll take you at your word, Mr. Taber,

9   that there is case law in this district — I'm not familiar with

10  it, quite honestly — where it has been established that someone

11  took a trade secret, then there is an assumption, a reliable

12  assumption, that they took perhaps others.

13         What we don't have in this case is the proof that

14  trade secrets have been stolen.  What we have in this case is

15  the fact that maybe trade secrets were used inappropriately in

16  the course of her employment, when she was clearly in the

17  course of her employment, she clearly had access to these

18  documents.  Appears to be no dispute about that.

19         MR. TABER:  Yes, correct.  There is no dispute she had

20  access as an employee to these materials.

21         There is a vigorous dispute that she was authorized to

22  take them because, in fact, the company's policies in its

23  handbook say unequivocally thou shalt not email it.  She has

24  come up with to this point an unsubstantiated explanation that

25  she says she was authorized to do it.  She can't tell us by

O6DVSECO

1    whom.  The names that I was given as the "by whom" by her

2    counsel are plainly incorrect.  The suggestion that her more

3    current supervisor gave it is also incorrect.  And we can

4    produce an affidavit from him, now that we hear that that may

5    be the claim, saying that he never did it.

6         She didn't have the right to have those materials at

7    the time she took them.  But even if we accept her story that

8    she had the right to have them for purposes of her work at that

9    time, when she left the company, she was under an obligation to

10   return all company materials.  That's a standard provision at

11   every company.  If you have confidential company materials,

12   they must be returned.  She did not return them.  She still has

13   them or had them until she handed them to Digital Mountain.

14        So whether intentional or not, for the moment, I'll

15   accept — although I don't credit it, the explanation — that it

16   wasn't intentional.  But let's accept that she had them

17   unintentionally.  She still had them.  And that possession of

18   those materials after she left her employment all by itself

19   amounts to misappropriation.  And she has to bring those back.

20   And that triggers --

21        THE COURT:  Those are slightly new arguments,

22   Mr. Taber.  But we should probably bring this to some kind of

23   an end, but not until Mr. Padro --

24        MR. PADRO:  I'll just have three quick points, and I

25   promise they will be very quick.

O6DVSECO

1          We clearly are going to dispute whether these are

2     trade secrets, I just want to make that clear.  There's no

3     admission or any form of that.

4          The second thing I would submit to you, as I think

5     your Honor is hitting on, there is no presumption of

6     irreparable harm here.  There has to be a showing of some

7     further disclosure, which there is nothing of that.  And that's

8     demonstrable by it.

9          And then I think what you didn't hear from Mr. Taber

10    are any other trade secrets, right.  And that's the problem

11    with what it is.  We've talked about the documents.  The

12    stipulation is a way that we can talk about dealing with those

13    documents.  The vague category of any other trade secrets, that

14    is prohibited under Rule 65, and I will tell you 65(d).  And if

15    I can, from my brief, document 32, page 23, I'll just read the

16    quote.

17               THE COURT:  Read slowly.

18               MR. PADRO:  Sorry, sorry, your Honor.

19          This is document 32, page 23, okay:

20          Under Rule 65(d), an injunction that prohibits the use

21    or disclosure of trade secrets or confidential information must

22    also specifically describe the nature of the secrets or the

23    confidential information to be protected.

24          The relief they put in front of the Court at the very

25    beginning here does none of that.  This is from the Second

O6DVSECO

1    Circuit.

2              MR. TABER:  Your Honor, if I may, the case that I was

3    referencing, where exactly the injunction we're describing was

4    entered, is *CrossBorder Solutions v. Hoy*, case number 20 CV

5    04877.  Decision was on -- the entry of that injunction was on

6    June 26, 2020, and I was counsel of record in that case.  That

7    was before Judge Román in White Plains.

8              THE COURT:  White Plains.  Okay.

9              MR. EPNER:  Your Honor?

10             THE COURT:  Mr. Epner.

11             MR. EPNER:  Yes.  I just want to briefly turn back to

12   the language that Mr. Taber has once again pointed to as having

13   come from SAFE.  And frankly, when I put it in my brief, I

14   thought maybe it was overkill to make this analogy:  My client

15   is married to somebody else in the cybersecurity industry.  So

16   the prohibition on the use of information learned or obtained

17   during the term of her employment literally -- if it was about

18   the cybersecurity industry, literally would prohibit her from

19   using information that she learned at her husband's office

20   picnic.

21             Your Honor, we have no dispute whatsoever with regard

22   to the documents.  I am confident that we can come to a

23   stipulation with regard to that.

24             With regard to everything else that Mr. Taber has

25   asked for, it is entirely inappropriate, and I urge you humbly

O6DVSECO

1    to deny it.

2              THE COURT:  Okay.

3              So this is what I'm going to do:  I'm going to direct

4    the parties to meet and confer concerning the appropriate

5    disposition of the documents.  Again, the representations have

6    been made that they have been -- again, I apologize for my

7    language, that they have been captured by Mr. Lee of Digital

8    Mountain; and that Mr. Lee has caused them to be safeguarded in

9    a way that only he and his colleagues at Digital Mountain and

10   the attorneys representing Ms. Polyakova and SAFE Securities

11   have access to them.

12             It appears that the defendants are willing to work

13   with plaintiffs to determine a way to dispose of those

14   documents that will both satisfy the plaintiffs that they have

15   been properly destroyed, and allow the defendants to maintain

16   copies that will allow them to properly litigate this case

17   going forward.

18             With respect to the other two aspects of the

19   preliminary injunction, I will not issue a preliminary

20   injunction today.  That is without prejudice.  I find that

21   there is an insufficient basis upon which to issue an

22   injunction concerning the supposed improper access by SAFE

23   Securities and its proxies, if such there are any, to access

24   the databases of SecurityScorecard.  Although I understand that

25   some forensic evidence exists to show that, in fact, there has

O6DVSECO

1    been an intrusion by SAFE Securities and its proxies into

2    SecurityScorecard's databases.  I don't think, or at least

3    there is not before me an adequate representation as to what,

4    if any, actual trade secrets have been accessed or taken.

5            With respect to the injunction of Ms. Polyakova, it

6    appears if counsel were to have a calm discussion without

7    loaded words on either side, that there is no apparent issue

8    concerning the probability of reaching language that will be

9    acceptable to both sides.  So I will direct you to continue to

10   find some way to stipulate going forward with respect to that

11   as well.  I mean, the points that Mr. Epner make seem to me to

12   make sense.

13           In terms of the likelihood that Ms. Polyakova has

14   access to information outside of her employment with -- prior

15   employment with SecurityScorecard, that ought not to be part of

16   an injunction.  I don't see why folks can't come up with

17   language to address that.  I don't think that there would be

18   any objection to defining such language on the part of

19   Mr. Taber; because if, in fact, her husband is also in the same

20   business and she receives information from him, it seems to me

21   as a general proposition, as a reasonable proposition, that

22   that ought not be covered by an injunction.

23           But, again, this is without prejudice, Mr. Taber, to

24   you coming back to me after having these discussions, providing

25   this additional information concerning the intrusions into

O6DVSECO

1   SecurityScorecard's databases.

2          And with that, I hope I have given you some clear

3   guidance as to what you need to discuss, and I will await to

4   hear from you.

5          Is there anything else that we should do this

6   afternoon?

7          MR. TABER:  I don't think so, your Honor.  I think

8   that covers the landscape.

9          THE COURT:  Mr. Padro?

10          MR. PADRO:  Nothing from our end.

11          THE COURT:  Mr. Epner?

12          MR. EPNER:  No your Honor.

13          THE COURT:  Okay.  This has been fun for me.

14          And we are adjourned, with many thanks to Madam Court

15   Reporter.

16          MR. TABER:  Thank you, your Honor.

17          MR. PADRO:  Thank you, your Honor.

18          MR. EPNER:  Thank you, your Honor.

19                         *    *    *

20

21

22

23

24

25