UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SECURITYSCORECARD, INC.,

                    Plaintiff,

– against –

SAFE SECURITIES, INC. *d/b/a* SAFE SECURITY *and* MARY POLYAKOVA,

                    Defendants.

**OPINION & ORDER**

24-cv-4240 (ER)

RAMOS, D.J.:

    SecurityScorecard, Inc. ("SSC") brought this action against Safe Securities, Inc. d/b/a Safe Security ("SAFE") and Mary Polyakova, alleging that SAFE and Polyakova misappropriated SSC's trade secrets in violation of the Defend Trade Secrets Act ("DTSA"), and that SAFE breached its end user agreement with SSC, interfered with the employment agreement between SSC and Polyakova, and engaged in unfair competition in violation of state common law. Doc. 148 at 20–30. Before the Court is SAFE's motion to compel SSC to produce documents responsive to 10 of SAFE's requests for production ("RFPs"). Doc. 157. For the reasons set forth below, the motion is GRANTED.

**I.    BACKGROUND**

    **A.  Factual Background**

    SSC is a Delaware corporation with its principal place of business in New York, New York. Doc. 148 ¶ 20.

    SAFE is a Delaware corporation with its principal place of business in Palo Alto, California. *Id.* ¶ 21.

    Polyakova worked for SSC from February 17, 2020 until April 9, 2024. *Id.* ¶ 22. She then began working for SAFE as its central sales vice president on May 30, 2024. *Id.* ¶ 23.

SSC provides ratings for the security of digital infrastructure for customers, including private businesses and governments worldwide, to help them monitor cybersecurity threats and manage security risks. *Id.* ¶¶ 29–30.  SSC estimates that the typical contract for SSC's services is in the "tens of thousands of dollars per year." *Id.* ¶ 35.  SSC's business development representatives and sales directors spend considerable time, energy, and resources identifying prospects and customers and its customer and prospect lists are the direct result of years of marketing and sales efforts, including its Master East List and Chief Information Security Officer-accessible ("CISO") Prospect Lists.  *Id.* ¶¶ 14, 38–41.  SSC's Master East List consists of 9,262 records of over 1,000 customers and prospects based in New York.  *Id.* ¶ 85.  The CISO Prospect Lists contain detailed contact information for over 200 CISO-level prospects, and the individual contacts of each such prospect, compiled by SSC as a way to track invites and RSVPs to business development events.  *Id.* ¶ 14.

Polyakova signed an employment agreement with SSC on February 8, 2020, agreeing to "keep in confidence … all [p]roprietary [i]nformation, and [] not directly or indirectly disclose, sell, use, lecture upon or publish any [p]roprietary [i]nformation or anything relating to it without the prior written consent" which includes "the names, addresses[,] and specifications of [SSC's] business partners and other associates."  Doc. 148-2 at 2–3.  She agreed to similar terms of confidentiality in SSC's offer letter, employee handbook, and acceptable use policy.  Doc. 148 ¶¶ 47–49, 54–59.

Polyakova began work as SSC's sales director on February 17, 2020 and then became its regional sales director on January 4, 2021.  *Id.* ¶ 43.  She served as SSC's central region sales director from June 1, 2022 until her termination on April 9, 2024.  *Id.* ¶¶ 22, 43, 87.  After her termination, on May 21, 2024, SSC discovered that she had sent SSC's Master East List and CISO Prospect Lists to her personal Gmail account earlier that year.  *Id.* ¶¶ 84–87.

Polyakova began working for SAFE, a competitor of SSC, on May 30, 2024, and

SSC alleges that she "intends to use [the two lists] to encourage SSC customers to leave SSC and bring their business to SAFE," and that "SSC customers have left SSC for SAFE, and prospective SSC customers have gone with SAFE instead of SSC." *Id.* ¶¶ 88–91.

In late 2023, SAFE signed up for "freemium" access to SSC's security platform to self-monitor its security ratings and see high-level security scores of five other organizations. *Id.* ¶ 62. At that time, SAFE signed SSC's user agreement, which forbids a user from accessing SSC's platform if they are a "direct competitor" or "build[ing] a competitive product or service or use [SSC's cybersecurity ratings and related third-party management services] in a way that competes with [its] products or services." *Id.* ¶¶ 62–63; *see also* Doc. 148-1. The agreement further stated that SSC services, and any proprietary materials provided through the services, constituted SSC's confidential information. Doc. 148 ¶ 64.

SSC alleges that SAFE, a "direct SSC competitor," intended to use the SSC platform "to encourage SSC customers and prospects to use SAFE's products and services" and performed competitive intelligence gathering. *Id.* ¶¶ 60, 67–74. SSC further alleges that SAFE conducted "bogus" hiring interviews with SSC employees "with the true purpose of gathering intelligence about SSC's business plans and [c]onfidential [i]nformation." *Id.* ¶¶ 5, 11, 75–77. SSC sent cease-and-desist letters to SAFE on May 3, 2024 and to an SSC employee who SSC believed was leaving SSC to work for SAFE on May 14, 2024, demanding compliance with the terms of confidentiality in SSC's employment agreements. *Id.* ¶¶ 78–81.

### B. Procedural History

SSC commenced this action against SAFE on June 4, 2024, asserting six causes of action against SAFE and Polyakova. *Id.* at 20–29. SSC alleged that: (1) SAFE and Polyakova used SSC's confidential information; (2) SAFE and Polyakova violated the DTSA, 18 U.S.C. § 1836; (3) SAFE and Polyakova misappropriated SSC's trade secrets

3

and confidential and proprietary information; (4) SAFE breached its end user agreement with SSC; (5) SAFE engaged in tortious interference with the employment agreement between SSC and Polyakova; and (6) SAFE engaged in unfair competition in violation of state common law. *Id.* SSC seeks injunctive relief, compensatory damages, punitive damages, attorneys' fees and costs, and pre- and post-judgment interest. *Id.* at 30–31.

SAFE requested a pre-motion conference to file a partial motion to dismiss SSC's claims on July 25, 2024. Doc. 69 at 1.[1] At that conference held on August 13, 2024, SSC agreed to amend its complaint to include new allegations concerning digital "footprints" and forensic evidence of SAFE's alleged conduct. Doc. 102 at 53, 55. The Court further directed the parties to proceed with discovery because it was clear that at least one or more claims were going forward. *Id.* at 53–54.

SAFE submitted its first set of RFPs (Nos. 1-65) on August 26, 2024. Doc. 159-2. SSC objected to RFPs 42, 48–55, and 61 on September 25, 2024 for lack of relevance, overbreadth, and burden and agreed to respond to 55 of the 65 RFPs. *Id.*; *see* Doc. 158 at 6. SSC has agreed to produce the following documents:

- SSC's creation and maintenance of the misappropriated documents and information (RFP Nos. 3, 6, 18–22, 43, 45);
- SSC's practice of maintaining the misappropriated documents and information as confidential (RFP Nos. 3, 6–10, 18-21, 43, 45);
- SAFE and Starlit Group's[2] access and use of SSC resulting in the misappropriation (RFP Nos. 4, 7, 15, 28, 31, 36, 37);
- Costs incurred by SSC in developing the misappropriated documents and information (RFP Nos. 3, 6, 18–22, 43, 45);
- Damages suffered by SSC (RFP Nos. 11, 16, 24);
- Loss of customers and opportunities as a result of SAFE's misappropriation (RFP

---

[1] The motion to partially dismiss the complaint is now fully briefed. Doc. 168.

[2] The amended complaint alleges that "SAFE was utilizing Starlit Group as a proxy to surreptitiously and impermissibly access the SSC platform to download and export SSC's work product to enhance and improve SAFE's own competitive product offerings and gain a competitive advantage." Doc. 148 ¶ 74.

- Nos. 11, 16, 24, 32, 40);
- Polyakova's contractual employment obligations to SSC (RFP No. 60); and
- General information about SSC, its services and customer platform, and how it operates (RFP No. 9).

Doc. 162 at 3–4.[3]

The ten remaining RFPs that are at issue here fall within the two categories, which generally concern SSC's knowledge of SAFE:

- Internal communications and communications with customers and potential customers regarding SAFE's platform, products, and offerings (RFP Nos. 48–51, and 55); and
- Documents regarding its competitive intelligence efforts, including its access to and evaluation of SAFE's product and efforts to recruit or hire SAFE employees (RFP Nos. 42, 52–54, and 61).

Doc. 158 at 7–12.

SAFE argues that the discovery at issue bears on "many issues central to SSC's claims [and] SAFE's defenses to those claims, including: (1) [t]he extent and scope of SSC's alleged harm, if any; (2) [w]hether any asserted information has economic value; (3) [w]hether SSC actually owns confidential information to assert; and (4) [w]hether the conduct SAFE is accused of is, in fact, 'improper' as alleged or is instead akin to SSC's own conduct and standard industry practices." Doc. 158 at 5.

SAFE and SSC met and conferred about the disputed RFPs on December 4, 2024, but SSC refused to provide them, asserting they were irrelevant and premature because SAFE had not yet answered the amended complaint. Doc. 159 ¶ 10. SSC filed its amended complaint on January 31, 2025. Doc. 148. SAFE and SSC again met and conferred on February 3, 2025, but were unable to resolve the dispute. Doc. 159 ¶ 11.

SAFE requested to meet and confer with SSC again on February 11, 2025 to

---

[3] As of February 26, 2025, SSC had "produced approximately 2,000 documents on all agreed upon topics[,] and document productions will continue on a rolling basis" Doc. 162 at 7. SSC explains that all the documents produced "pertain to all issues … concerning liability and damages." *Id.*

5

resolve the dispute, but SSC replied that it did not believe there was anything further to discuss. Doc. 159-5 at 2–3. SSC served subpoenas on February 12, 2025 on third-party customers,[4] seeking, among other things, comparative analysis between SSC and SAFE and their platforms and any communications with SAFE regarding SSC and its platform. Docs. 159-6, 159-7, 159-8.[5] SAFE filed the instant motion on February 14, 2025. Doc. 157.[6]

## II.   LEGAL STANDARD

### A.  Motion to Compel

Federal district courts have broad discretion in deciding motions to compel. *See Grand Central Partnership, Inc. v. Cuomo*, 166 F.3d 473, 488 (2d Cir. 1999). The scope of discovery is generally limited to any "nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

The information sought need not be admissible at trial as long as the discovery appears reasonably calculated to lead to the discovery of admissible evidence. *Id.* Relevance "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on [] any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (citing *Hickman v. Taylor*, 329 U.S. 495, 501 (1947)). Furthermore, "[p]roportionality and

---

[4] SSC specifically subpoenaed Veterinary Emergency Group, LLC, Veralto Corporation, and Leprino Foods Company. Docs. 159-6, 159-7, 159-8.

[5] SAFE argues that the discovery in dispute is the same information that SSC subpoenaed from its former customers. Doc. 158 at 5.

[6] Although SAFE never filed a reply, at a conference on March 14, 2025, the Court confirmed with SSC and SAFE that the motion to compel was fully briefed. Doc. 165 at 3–4.

relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Vaigasi v. Solow Management Corp.*, No. 11-cv-5088 (RMB) (HBP), 2016 WL 616386, at *14 (S.D.N.Y. Feb. 16, 2016) (citation omitted).

"The party resisting discovery bears the burden of showing why discovery should be denied." *Cole v. Towers Perrin Forster & Crosby*, 256 F.R.D. 79, 80 (D. Conn. 2009) (citation omitted). "General and conclusory objections as to relevance, overbreadth, or burden are insufficient to exclude discovery of requested information." *Melendez v. Greiner*, No. 01-cv-7888 (SAS) (DF), 2003 WL 22434101, at *1 (S.D.N.Y. Oct. 23, 2003). Instead, "[a] party resisting discovery has the burden of showing specifically how, despite the broad and liberal construction afforded the federal discovery rules, each [discovery request] is not relevant or . . . is overly broad, burdensome or oppressive." *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 102–03 (S.D.N.Y. 2013) (internal quotation marks and citations omitted).

## III.   DISCUSSION

SSC opposes SAFE's motion to compel the production of ten disputed RFPs, which are described below:

- RFP Nos. 48, 50, and 55 seek internal SSC documents and communications that compare SSC's platform, products, and offerings to SAFE's.
- RFP No. 49 seeks documents and communications with customers and potential customers regarding SAFE and its products and offerings.
- RFP No. 51 seeks documents identifying, analyzing, or discussing the market for SSC's product.
- RFP Nos. 42 and 52–54 seek information about SSC's competitive intelligence efforts, including its access to and evaluation of SAFE's product.
- RFP No. 61 seeks documents regarding SSC's efforts to recruit or hire SAFE employees.

Doc. 158 at 8–12.

### B. Relevance

*1. SSC's Internal and Customer Communications Regarding SAFE's Platform, Product, and Offerings (RFP Nos. 48–51, and 55)*

SSC explains that it has already agreed to produce some of the requested discovery, specifically "discovery on 'former or current SSC customers switching to SAFE, including [c]ommunications discussing customers' reasons for switching from SSC to SAFE.'" Doc. 162 at 11. SSC argues that the discovery that it has agreed to produce "are what informs the issue of causation, not SSC's marketing efforts or communications with its customers about those efforts." *Id.*

"It is well established that a requesting party may seek, through discovery, to ascertain the factual basis for a requested party's allegations[.]" *Cliffstar Corp. v. Sunsweet Growers, Inc.*, 218 F.R.D. 65, 71 (W.D.N.Y. 2003) (citations omitted). SSC describes the "approximately 2,000 documents on all agreed upon topics and document productions" as "pertain[ing] to all issues in the case concerning liability and damages" and "already substantiat[ing] claims that SAFE's improper conduct has caused competitive harm to SSC." Doc. 162 at 7, 9. However, SSC fails to acknowledge that SAFE "ha[s] [not] conceded liability here . . . [W]hat these requests are relevant to are damages [SSC] believe[s] [it] ha[s] sustained as a result of the harm, not that there was no harm[.]" Doc. 159-4 at 15.

Thus far, the documents SSC has agreed to produce allegedly do not provide information on whether the misappropriated information *drove* customer decision-making, and how that *directly impacted* the economic value of the information. Doc. 158 at 11; *see Rodo Inc. v. Guimaraes*, No. 23-cv-9736 (VSB), 2023 WL 315302, at *2 (S.D.N.Y. Jan. 19, 2023) ("The determination of whether particular information is a trade secret is typically a fact-intensive inquiry," and "the economic value of information . . . factor[s] into whether information is a trade secret.") (internal quotation marks and citation omitted). While SSC claims that "[m]issing from [SAFE's] argument . . . is any rationale of how SSC's own marketing efforts could possibly inform the reasons for its

8

own customers' departure," SAFE offers the specific justifications as to why the documents sought will allow it to "understand how SSC markets its products as different or advantageous over SAFE's, and [thus] whether [its] alleged conduct is the proximate cause of SSC's purported loss of customers." Doc. 162 at 11 (emphasis omitted); Doc. 158 at 10–11. SAFE further explains that "[s]imply because a customer decided to engage with SAFE instead of SSC does not establish that the customer's decision was the result of [SAFE's] alleged [misappropriation]." Doc. 158 at 10; *see also E.J. Brooks Co. v. Cambridge Security Seals*, 31 N.Y. 3d 441, 449 (2018) ("[D]amages in unfair competition cases should correspond to 'plaintiff's losses [that] were a proximate result of defendants' conduct[.]'" (citation omitted)).

First, "SSC's internal evaluation of SAFE's standing in the marketplace versus its own directly bears on whether or not SAFE's product actually competes with SSC's product … and whether SSC has suffered any harm as a result of the alleged misappropriation." Doc. 158 at 8–9. RFP Nos. 48, 50, and 55 seek internal SSC documents and communications regarding SAFE, including those describing how SSC compares its platform, products, and offerings from SAFE's, and RFP No. 51 seeks documents identifying, analyzing, or discussing the market for SSC's product. Doc. 158 at 8–11. "[I]f SSC has internally assessed the parties' [] products or offerings to identify similarities and differences, such similarities and differentiating factors bear on whether and to what extent SAFE could have used the allegedly misappropriated information." Doc. 158 at 9 (citing *Big Vision Privacy Ltd. v. E.I. DuPont De Nemours & Co.*, 1 F. Supp. 3d 224, 274–75 (S.D.N.Y. 2014) (finding that there was no misappropriation where defendant's product differed substantially from the alleged trade secrets)).

Second, SSC alleges that due to the alleged misappropriation, it lost customers to SAFE, but it has not produced its *communications* with customers that would directly link SAFE's alleged misappropriation to customers leaving SSC for SAFE. *See* Doc. 158 at 9. SSC has produced discovery on "former or current SSC customers switching to

9

SAFE, including [c]ommunications discussing customers' reasons for switching from SSC to SAFE," but that discovery does not include direct communications between SSC and its potential customers. Doc. 162 at 11. RFP No. 49 seeks documents and communications with customers or potential customers regarding SAFE and its products and offerings. Doc. 158 at 9. These communications can show whether SAFE's alleged conduct led customers to choose SSC over SAFE and the importance they placed on the alleged confidential information or changes to SAFE's product when choosing SAFE, which directly relates to the harm SSC claims. *See, e.g., Kurin, Inc. v ICU Medical Inc.*, No. 24-cv-564 (FWS) (ADSX), 2024 WL 5717968, at *6 (C.D. Cal. Nov. 22, 2024) (granting motion to compel production of business plans, competitive analyses, and plaintiff's consumer base because they were relevant to "whether Defendant's [conduct] caused customers to purchase one of two competing products over the other.").

Lastly, SSC's issuance of subpoenas to third parties, including its customers, for "all documents and communications relating to any comparative analysis between SSC and SAFE" and their respective platforms illustrates that SSC itself views these communications to be relevant to the case, even though it refuses to produce this discovery to SAFE. Docs. 159-6, 159-7, 159-8.

* * *

Accordingly, SAFE is entitled to discovery of SSC's communications internally and with its customers because they are relevant to SSC's causal allegations.

2. *SSC's Competitive Intelligence Efforts regarding SAFE's Product, Offerings, and Employees (RFP Nos. 42, 52–54, and 61)*

SSC argues that SAFE cannot attempt to "obtain further information of [its] competitive intelligence to enable [SAFE] [,] the wrongdoer[,] to uncover *potential* defenses or *potential* counterclaims." Doc. 162 at 10 (citing *Collens v. City of New York*, 222 F.R.D. 249, 253 (S.D.N.Y. 2004)).

The Court instructed the parties to proceed with discovery on August 13, 2024

10

because it was clear that at least one or more claims were going forward. Doc. 102 at 53–54. Here, SAFE has not filed an answer to the amended complaint because of the pending partial motion to dismiss. *See* Doc. 168. Thus, SAFE cannot formally assert its defenses until after its motion to dismiss is resolved. As SAFE highlights, "[i]t would be inefficient … if discovery were limited only to materials SSC [chose] to support its allegations until SAFE answers the complaint," particularly because SSC knows "the defenses SAFE intends to assert, and the parties are [currently] proceeding with depositions." Doc. 158 at 14.

SAFE argues that its potential unclean hands defense demonstrates the relevance of SSC's competitive intelligence efforts. Doc. 158 at 11–12. SSC is not entitled to the permanent injunctive relief it seeks in its amended complaint if it has engaged in "conduct identical to that which it now decries." *Id.* at 11; *see, e.g., Procter & Gamble Co. v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 354–55 (S.D.N.Y. 2008) (denying motion for preliminary injunction because, among other things, the plaintiff could not meet its burden of demonstrating irreparable harm where the plaintiff has engaged in the same behavior it alleged); *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 532–33 (S.D.N.Y. 2009) (denying motion for preliminary injunction, among other things, where the plaintiff has engaged in the same behavior it alleged). SSC counters that that the amended complaint "does not assert allegations against SAFE's competitive intelligence" regarding SSC and the general market, so "SSC's competitive intelligence is not relevant as the document requests do not seek information regarding 'conduct identical to that which it now decries.'" Doc. 162 at 11.

RFP Nos. 42 and 52–54 seek information about SSC's competitive intelligence efforts, including SSC's access to and evaluation of SAFE's product, and RFP No. 61 seeks documents regarding SSC's efforts recruit or hire SAFE employees. Doc. 158 at 11–12. Here, the amended complaint alleges that SAFE engaged in unfair competition because it "gather[ed] intelligence about SSC by conducting bogus interviews with SSC

11

employees with no intent to hire them." Doc. 148 ¶ 11. Thus, the Court recognizes that SSC's potential competitive intelligence efforts may be relevant to the unclean hands defense. These efforts may be important in resolving a disputed issue, one of the factors that courts take into consideration when deciding whether to grant or deny motions to compel. Fed. R. Civ. P. 26(b)(1). If this discovery confirms that SSC had access to SAFE's product and was "pulling it apart" and that "SSC has been contacting and interviewing SAFE employees to probe information about SAFE" as SAFE believes, Doc. 158 at 12, SSC may be unable to obtain injunctive relief. *See Stokely-Van Camp*, 646 F. Supp. 2d at 532–33. SSC should produce the documents responsive to these RFPs that could demonstrate its own competitive intelligence efforts, as such evidence bears on whether SSC has unclean hands.

### C. Proportionality

1. *SSC's Internal and Customer Communications regarding SAFE's Platform, Product, and Offerings (RFP Nos. 48–51, and 55)*

SSC argues that the "expansive scope of discovery SSC has already agreed to produce" makes anything additional discovery "overbroad, irrelevant, and inordinate. . ." Doc. 162 at 12. Such "[g]eneral and conclusory objections as to relevance, overbreadth, or burden are insufficient to exclude discovery of requested information." *Melendez*, 2003 WL 22434101, at *1. SSC has not detailed how the burden of responding "outweighs its likely benefit," and the Court is reluctant to accept generic statements that may preclude relevant discovery to the resolution of this case. Fed. R. Civ. P. 26(b)(1); *see Fort Worth*, 297 F.R.D. at 102–03 (explaining how a party resisting discovery must *specifically* show how a discovery request is "not relevant" or is "overly broad, burdensome or oppressive."). Although reviewing and producing additional documents will require time and expense, SSC does not adequately explain why reviewing and producing these documents is disproportional to the needs of this case. Thus, discovery of SSC's communications about SAFE internally and with its customers is appropriate.

12

2. *SSC's Competitive Intelligence Efforts regarding SAFE's Product, Offerings, and Employees (RFP Nos. 42, 52–54, and 61)*

Given that the RFPs regarding SSC's competitive intelligence efforts are relevant to SSC's claims and SSC does not specify how production would be overbroad and unduly burdensome, the requested discovery is proportional to the needs of the case. In this District, "[p]roportionality and relevance are 'conjoined' concepts; the greater the relevance of the information in issue, the less likely its discovery will be found to be disproportionate." *Vaigasi*, 2016 WL 616386, at *14 (citation omitted). The Court previously stated that "[w]hat [SAFE is] asking for is documents related to your alleged harm . . . that would be clearly relevant and that would not . . . negate necessarily the fact that you have been harmed." Doc. 159-4 at 16. SSC agreed, stating "that is the information that is relevant and that [i]s the information we've already agreed to produce," but countered that SAFE is "going well beyond [what is relevant] with their specific demands." *Id.*

The documents that SSC has produced so far are all about SAFE's alleged conduct and infliction of harm, and SSC has not produced documents about SSC's potentially similar conduct. Doc. 159-4 at 7. As previously stated, if SSC is engaging in the same type of competitive conduct it alleges against SAFE, it has unclean hands and would not be entitled to injunctive relief. *See Stokely-Van Camp*, 646 F. Supp. 2d at 532–33. Accordingly, producing documents regarding SSC's competitive intelligence efforts are proportional to SAFE's potential unclean hands defense.

IV. **CONCLUSION**

For the foregoing reasons, the motion is GRANTED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 157.

SO ORDERED.

Dated: September 5, 2025
       New York, New York

                                                           Edgardo Ramos, U.S.D.J.